**Dale L. WILLIAMS, M.D., Plaintiff,**

v.

**Justin I. KLEAVELAND, M.D.; Austin Aardema, M.D.; Lloyd J. Lemmen, M.D.; Max J. Busard, M.D.; Marlin P. Krenz, M.D.; Leland E. Holly, II, M.D.; Donald K. Crandall, M.D.; Guido W. Annessa, M.D.; Richard Peters, M.D.; Sisters of Mercy Health Corporation d/b/a Mercy Hospital, a Michigan non-profit corporation, and Hackley Hospital, a Michigan non-profit corporation, Defendants.**

No. G78–647.

United States District Court,
W. D. Michigan, S. D.

Nov. 30, 1981.

914

Kenneth Frankland, Lansing, Mich., for plaintiff.

J. Terrence Dillon, Grand Rapids, Mich., David Ettinger, Detroit, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case is before the Court pursuant to Defendants' Motions for Summary Judgment. Plaintiff, Dale L. Williams, M.D., who was deprived of his staff privileges at both Mercy Hospital and Hackley Hospital, asserts that he lost these privileges because of Defendants' violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2. He seeks both equitable relief and treble damages.

Plaintiff is a board certified specialist in family practice in Muskegon, Michigan, and is presently a member of the hospital staff of Heritage Hospital in Muskegon. He alleges that Defendant Mercy Hospital, a non-profit hospital in Muskegon; Guido W. Annessa, M.D., chief of staff of Mercy Hospital; Richard Peters, M.D., a member of the ad hoc committee which evaluated Plaintiff's qualifications to retain hospital

privileges at Mercy; and Donald K. Crandall, M.D., a member of both the executive committee of Mercy Hospital and of the ad hoc committee, acted in concert with other named Defendants in wrongfully removing him from the Mercy staff.

Plaintiff makes similar allegations against Hackley Hospital, a non-profit corporation in Muskegon; Justin I. Kleaveland, M.D., chief of cardiology at Hackley Hospital; Austin Aardema, M.D., chief of medicine at Hackley, and chairman of the ad hoc committee which reviewed Plaintiff's credentials; Lloyd J. Lemmen, M.D., a member of the ad hoc committee; J. Max Busard, M.D., a member of the Board of Trustees of Hackley Hospital which confirmed Plaintiff's removal from the Hackley staff; Marlin P. Krenz, M.D., chief of staff of Hackley Hospital, and the individual who appointed the ad hoc committee which reviewed Plaintiff's credentials; and Leland F. Holly, II, M.D., a member of the ad hoc committee at Hackley.

Count I of the Complaint charges that on or before July 13, 1976, Defendants Mercy, Crandall, Annessa, and Peters unjustifiably, and as a product of collective thought and planning determined that Plaintiff's plans for the establishment of a health maintenance organization in Muskegon County constituted a threat to the hospital's and individual practitioners' trade and business and therefore decided to review his credentials with the intention of destroying Plaintiff's ability to practice medicine in the area. He claims that, within a month of the initiation of proceedings at Mercy, Hackley Hospital, and Defendant doctors on the Hackley staff, commenced against against him for the same reason.

By preventing him from practicing in the two largest American Medical Association accredited hospital facilities in Muskegon (Defendants claim that the AMA is not an accrediting agency), Plaintiff contends that Defendants prevented him from effectively competing with the individual physician Defendants in the practice of medicine, from competing with the hospitals by providing alternative care, denied him access to mo-

nopoly services at the hospitals, and that these actions constituted a combination and conspiracy to boycott Plaintiff in violation of Section 1 of the Sherman Anti-Trust Act. By refusing to permit him to practice on the hospital staff, Plaintiff charges that Defendants conspired to monopolize trade and commerce (the practice of general medicine), and that the individual doctors acquired total control over the access to hospital medical practice by competing physicians. He claims that they have acted in concert to prevent Plaintiff's entry as a competitor in violation of Section 2 of the Act. Additionally, Plaintiff charges that Defendants attempted to monopolize a part of commerce or trade which is also a violation of Section 2.

■ Defendants contend that Plaintiff's allegations are fatally deficient because he is unable to show the requisite public injury as a result of his dismissal and that if he has any action at all, Plaintiff must seek redress in a private tort action in the state court. Defendants claim that there has been no adverse effect on competition, emphasizing the requirement of the anti-trust laws and that there must be injury to *competition* and not to the competitor, and that there has been no evidence to suggest, and that Plaintiff will be unable to do so at trial, that Defendants' actions affected anyone besides Dr. Williams. Where there is no per se violation of the Sherman Act, the Court must determine whether or not the activity in question unreasonably restrains trade. *Lamb Enterprises, Inc. v. Toledo Blade Company*, 461 F.2d 506, 517 (CA 6 1972) cert. den. 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972).

■ All parties agree that this case is governed by the "rule of reason" rather than the "per se" standard. Under Sections 1–7 of the Sherman Act, some agreements and practices are invalid per se while others are illegal only as applied to particular situations. *U.S. v. E.I. DuPont de Nemours & Company*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Refusal to deal becomes illegal under Sections 1–7 of the Act only when it produces an unreasonable restraint

of trade, such as price fixing, elimination of competition or creation of a monopoly. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (CA 6 1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 reh. den. 375 U.S. 982, 84 S.Ct. 479, 11 L.Ed.2d 428 (1963).

 There is a heavy presumption against implicit exemptions from the Sherman Act's proscription of activities in restraint of trade or commerce. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Thus, there is no blanket exemption to the anti-trust laws for the learned professions. *Selman v. Harvard Medical School*, 494 F.Supp. 603 (S.D. N.Y.1980). However, the Supreme Court in *Goldfarb* has acknowledged that some exemptions do exist:

> The fact that a restraint operates upon a profession as distinguished from a business, is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today. *Id.* 421 U.S. at 788 n.17, 95 S.Ct. at 2013 n.17.

See *Nara v. American Dental Association*, 526 F.Supp. 452 (W.D.Mich.1981).

Many of the learned professions are licensed and regulated by the state, as is the medical profession. The Supreme Court in *Goldfarb* also distinguished between action which is "prompted" by the state, and that which is "compelled" by direction of the state acting as sovereign. *Id.* 421 U.S. at 791, 95 S.Ct. at 2015. In this context, the relevant statute M.C.L.A. § 333.21513 provides:

**DUTIES AND RESPONSIBILITIES OF OWNER OPERATOR OR GOVERNING BODY**

Sec. 21513. The owner, operator, and governing body of a hospital licensed under this article:

(a) Are responsible for all phases of the operation of the hospital, selection of the medical staff, and quality of care rendered in the hospital.

(b) Shall cooperate with the department in the enforcement of this part, and require that the physicians and other personnel working in the hospital and for whom a license or registration is required be currently licensed or registered.

(c) Shall assure that physicians admitted to practice in the hospital are granted hospital privileges consistent with their individual training, experience, and other qualifications.

(d) Shall assure that physicians admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and improving the care provided in the hospital for patients. This review shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital.

Given this state required responsibility, and considering that the public interest involved is significant, I refused to substitute my judgment for that of the hospital's determination of what constituted appropriate medical care and what standards were to be utilized in a physician referral system in *Smith v. Northern Michigan Hospitals*, 518 F.Supp. 644 (W.D.Mich.) (1981) in granting a motion for summary judgment. Defendants urge the same result here. However, in considering a Motion for Summary Judgment, a District Court must determine whether any material factual issues exist which can only be resolved through a trial. *United States v. Allen*, 578 F.2d 236 (CA 9 1978). In the past, the general belief was that summary judgment had little or no application to antitrust cases. *Poller v. Co-*

*lumbia Broadcasting Systems*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). While trial courts are still reluctant to grant Motions for Summary Judgment in antitrust actions, the Supreme Court changed the rule somewhat in *First National Bank v. Cities Service Company*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968):

> To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint. *Id.* at 289–290, 88 S.Ct. at 1592–93.

In urging the Court to grant summary judgment at this time, the Defendants omit one significant factor. In *Smith, supra*, extensive discovery had been undertaken and completed. Having found that plaintiffs had ample opportunity to develop factual support for their theories and had failed to do so, I concluded that summary judgment was appropriate. In this instance, discovery is not yet complete. *Aviation Specialties, Inc. v. United Technologies Corporation*, 568 F.2d 1186 (CA 5 1978) applies to this situation.

> The grant or denial of a continuance rests with the discretion of the district court, and appellate review aims only at determining whether the district judge abused that discretion... We find no abuse of discretion in the case at bar because plaintiff failed to proceed promptly with

the discovery he sought, a significant amount of discovery took place notwithstanding plaintiff's lack of diligence, and the substance of plaintiff's disallowed discovery requests, under the circumstances, indicated that the further discovery sought would not be helpful. *Id.* at 1189.

Plaintiff filed his Complaint in 1978. In this case, Plaintiff has asked for, and I have denied, an extension to conduct discovery. I find that there has been ample opportunity for the Plaintiff to conduct discovery. Having set a deadline for the completion of discovery and having required Plaintiff to meet that deadline, I will not deprive him of the opportunity to develop the evidence necessary to support his claim.

 It is well settled that a hospital may refuse to grant hospital privileges to a physician or may terminate a physician for misconduct. See *Gouda v. Detroit Macomb Hospital Association*, 52 Mich.App. 516, 217 N.W.2d 905 (1974); *Levin v. Doctors Hospital, Inc.*, 233 F.Supp. 953 (1964); *Robinson v. Magovern, et al.*, 521 F.Supp. 842 (W.D. Pa.1981). That a hospital may dismiss a physician from its staff for misconduct does not mean that it may terminate privileges for arbitrary reasons.[1] The rules established by hospitals to regulate the conduct of doctors must be capable of objective application. *Gouda, supra.* In *Gouda*, the court found that the defendant hospital had accorded plaintiff his due process rights and had not illegally conspired, monopolized, or acted improperly when it terminated the plaintiff for inaccurate record keeping and deviation. In *Levin v. Doctors Hospital, Inc., supra*, the court found that there was no violation of Section 1 of the Sherman Act from the "(E)ndeavors of professional groups to raise the ethical standards of their profession and to enhance the quality of services rendered to the public." On the contrary, the court stated that these aims were to be encouraged and commended. Here, the argument is not that the Defend-

---

1. Participants in an unjustified group boycott may not insulate themselves from antitrust liability merely by showing that they afforded their victims procedural due process before imposing the boycott. *McDonnell v. Michigan Chapter No. 10 American Institute of Real Estate Appraisers of National Association of Real Realtors*, 587 F.2d 7 (CA 6 1978).

ants were attempting to raise the professional conduct of staff physicians but rather the question is whether or not Plaintiff's conduct was substandard so that termination of privileges was warranted.

As the Court in *Robinson, supra,* indicated, most cases in federal court challenging the denial of staff privileges have been brought on due process or civil rights theories. Here, it is admitted that Plaintiff was given extensive opportunity for hearing and review, the right to present witnesses, and to be represented by an attorney during the review process. Plaintiff contends that there was no serious question of his performance or competence, but that this review was undertaken as a subterfuge, and that Defendants' real purpose was to eliminate him as a competitor because of his intention to establish a Health Maintenance Organization, and because of his insistence on providing alternative means of delivering health care via the use of physician assistants.

While there is debate on the issue, I find that the record shows, for summary judgment purposes at least, that Defendants' activities have a substantial effect on interstate commerce. *Hospital Building Company v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

> The plaintiff alleges that the defendants combined to exclude him from participating in a specialty within the medical profession that has significant links with interstate commerce. We hold that these links establish a sufficient nexus between the activities of the defendants and interstate commerce to support the application of the federal antitrust laws to the alleged restraint of trade by Allegheny General and by certain surgeons on the hospital's staff. *Robinson, supra,* at 877.

■ Under the rule of reason analysis, damages are not presumed and all restraints on trade are not prohibited. Rather, the Plaintiff must prove that the public has in fact been injured, and that the re-

straint in question is unreasonable, again considering the public interest. *Continental T.V. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Only if the anticompetitive effects predominate will there be a violation of Section 1. As a consequence, Plaintiff has the burden of proving the unreasonableness of the restraint alleged here. *Sitkin Smelting & Refining Company, Inc. v. FMC Corporation,* 575 F.2d 440 (CA 3 1978) cert. den. 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). In other words, Plaintiff must prove that the restraint actually harmed the public by reducing competition. An examination of the legality of conduct which is alleged to be anticompetitive requires an evaluation of the consequences of such conduct in the affected market.

This Court is aware of recent litigation in which ostensible professional standards were found to have an unreasonable anticompetitive effect or were found to be a sham. See *United States Dental Institute, et al. v. American Association of Orthodontists,* 396 F.Supp. 565 (N.D.Ill.1975). However, if the criteria used by Defendants in evaluating Dr. Williams' privileges were reasonably related to the hospital's legitimate institutional objectives, if these objectives do not impose an unreasonable restraint on trade, and if they are not imposed as a sham, they must be upheld.

> As we interpret the Court, to survive a Sherman Act challenge a particular, practice, rule, or regulation of a profession, whether rooted in tradition or the pronouncements of its organizations, must serve the purpose for which the profession exists, *viz* to serve the public. Those which only suppress competition between practitioners will fail to survive the challenge. This interpretation permits a harmonization of the ends that both the professions and the Sherman Act serve. *Boddicker v. Arizona State Dental Association,* 549 F.2d 626 (CA 5 1977).

■ I am aware that while in some instances, lay members of the public serve on executive boards of hospitals, the determination of the medical competence of a phy-

sician is peculiarly within the domain of the medical profession. Although members of the public in general and of other professions, in particular, may effectively ascertain the effects of ethical codes prohibiting advertising, the establishment of fees, and other conduct which essentially concerns the economic aspects of the profession, it is my view that physicians themselves are best able to evaluate the competence and skill of another physician and to take appropriate action in the public interest. In fact, I suspect that too often there has been a "conspiracy of silence" in which members of the medical profession who were in the best position to know the situation, refused to refer their own patients to a physician they deemed less than competent, but took no action to protect the public at large. This failure to act has been one of the motivating factors in legislation providing for hospital review of staff privileges. Because monetary damages are not truly an adequate substitute for injury caused by improper medical care, in the absence of an anticompetitive intent or purpose, proof that Defendants acted for the primary purpose of maintaining high quality patient care is a persuasive defense to an antitrust claim.

... Every appropriate application of conventional antitrust principles to the health care industry must account for great dissimilarities between the present day health care sector and the traditional commercial context in which classical antitrust doctrines developed. Because of the professional, social, and economic complexities of health care delivery, physicians and hospitals cannot be held to the same pro-competitive rules as the makers of cellophane and aluminum; our society is willing to tolerate large-scale production and consumption of cut-rate aluminum and cellophane, but is unwilling to tolerate the large-scale production and consumption of substandard health care services. Additionally, application of "rules of the marketplace" assumes that consumers can balance quality against cost, a dubious assumption in the context of health care... Before the courts at-

tempt to coerce health care providers into more competitive modes of behavior, *they should be reasonably certain that more competitive behavior not only is possible, but is desirable as well.* 7 Am.J. of Law & Medicine, Vol. 1, 1981 at iii. (Emphasis supplied)

However providing quality medical care and facilities literally is a big business. It is certainly possible that having invested funds into a particular method or form of providing health care services, the decision makers consider the economies of scale rather than optimal patient care as the motivating factor. In the context of health maintenance organizations, those who disfavor them have been accused simply of trying to maintain the status quo by those who advocate that they provide a viable alternative to the traditional *and expensive* methods of providing medical care as it exists today. *In Re Forbes Health System Medical Staff,* File No. 781–0009, FTC (6/27/79) is indicative of the governmental interest in assuring that viable alternatives to traditional forms of medical care are considered. As a result of this action, the Forbes Health System Medical Staff of Pittsburgh, PA, under a proposed consent order, would be prohibited from unreasonably discriminating against health maintenance organization or other non-fee-for-service applicants or HMO providers admitted to the medical staff.

In proving that there has been a violation of Section 1 of the Sherman Act, Plaintiff must show a harmful effect on a generalized market. *Havoco of America, Ltd. v. Shell Oil Company,* 626 F.2d 549, 1980–2 CCH Trade Cases 63,425 (CA 7 1980). Therefore, Plaintiff must prove that there has been a substantial lessening of competition, monopolization, or contract in restraint of trade and must prove this effect in both the relevant product and geographical markets. *Robinson, supra.* The test of "relevant market" for antitrust purposes is that of reasonable interchangeability, considering price, use, and qualities. *Affiliated Music Enterprises, Inc. v. Sesac, Inc.,* 160 F.Supp. 865, aff'd 268 F.2d 13, cert.

den. 361 U.S. 831, 80 S.Ct. 82, 4 L.Ed.2d 74 (1958). As the *Robinson* court explained, a properly defined product market includes all products—both items that are presently available and those which may potentially become available—that have a significant, positive cross-elasticity of demand. In essence, the product market includes those products that consumers perceive as reasonable substitutes for each other. *Robinson, supra,* at 70. The relevant geographic market is the territory within which a defendant can operate without encountering other suppliers who have the ability to compete on substantial parity. A defendant has market power if it can exclude competition from a particular territory. See *United States v. Kimberly-Clark,* 264 F.Supp. 439 (N.D.Cal.1967). The appropriate analysis under the rule of reason standard requires further that the antitrust violation be the *direct* cause of the plaintiff's injury. *Havoco of America, Ltd. v. Shell Oil Company, supra.* Plaintiff may not claim damages under the antitrust statutes for results which have transpired as a consequence of extraneous causes.

Defendants have urged the Court to find that officers or agents of a corporation or business entity cannot conspire among themselves. This is the general rule although it may be modified when an officer has an independent personal stake in achieving the corporation's illegal objective. *Greenville Pub. Co. Inc. v. Dally Reflector, Inc.,* 496 F.2d 391 (CA 4 1974). As the Court in *Robinson* found, it is possible that the individual physician defendants had an individual personal interest in eliminating competition. Cf. *Sokol v. University Hospital, Inc.,* 402 F.Supp. 1029 (D.Mass. 1975). While it may well be a remote possibility, for purposes of summary judgment, I cannot conclude as a matter of law, that the individual physicians were not acting in a dual capacity. Similarly, recognizing that the possibility of harassing and vexatious litigation may deter responsible physicians from serving on a peer review committee, I conclude that the "good faith" defense as recognized in *Feminist Women's Health Center v. Mohammed,* 415 F.Supp. 1258 (N.D.Fla.1976) is applicable. The Court in *Mohammed* discussed this bona fide concern for the public welfare as a defense when the plaintiff had established a per se boycott or refusal to deal. Since the hospital is required to establish and maintain standards pursuant to statute, and since the hospital cannot act except through its personnel, good faith must be presumed. Plaintiff must bear the burden of proving that the individual doctors acted for illegal purposes to benefit their private practices rather than to maintain the legitimate standards of the hospital.

While the antitrust laws are not a high powered version of the laws relating to breach of contract, and while the traditional antitrust actions must show that the public could not have bought the "product" elsewhere, *Overseas Motors, Inc. v. Import Motors, Ltd.,* 375 F.Supp. 499 (E.D.Mich.1974) aff'd, 519 F.2d 119 (CA 6 1975) cert. den. 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Franklin Sewing Machine Company, Inc. v. Necchi Sewing Machine Sales Corporation,* 160 CCH Trade Cases, 69,757 (CA 6 1960), because of the differences enumerated in this Opinion between the practice of medicine and other economic activity, I am reserving judgment on whether depriving a patient of his choice of physician by itself constitutes a restraint of trade. In other words, bearing in mind the personal qualities of the doctor-patient relationship, I order the parties to address the question whether the fact that there were "other physicians available" to Dr. Williams' patients, by itself, precludes the requisite public injury.

A conspiracy to drive out of business or to destroy a competitor may give rise to claims under both Section 2 and Section 1 of the Act governing monopolization or the attempt to monopolize. *State of Arizona v. Cook Paint & Varnish Company,* 391 F.Supp. 962, aff'd 541 F.2d 226, cert. den. 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1975). Generally speaking, Section 1 deals with the means used to restrain trade while Section 2, which condemns the result

to be achieved, deals with the ends. *Forrest v. Capital Building and Loan Association*, 385 F.Supp. 831, aff'd 504 F.2d 891, cert. den. 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1973). Therefore, Section 2 is not aimed at allegedly improper conduct but at the resulting market structure. However, bigness is not necessarily badness, and a monopoly is not necessarily illegal under Section 2. *Hatley v. American Quarter Horse Association*, 552 F.2d 646 (CA 5 1977).

Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. *United States v. Griffith*, 334 U.S. 100 [68 S.Ct. 941, 92 L.Ed. 1326] (1948).

*Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 360 F.Supp. 693, rev'd on other grounds 490 F.2d 48 (E.D.Pa.1973) holds that when the activities within a conspiracy complained of are intrastate in character, the plaintiff must show that the restraint of trade directly and substantially affects interstate commerce in order to have a violation of the Act. Defendants claim that Plaintiff has not shown the direct and substantial effect required. To date, it is true, the record indicates that Plaintiff has alleged that he is the only physician harmed by the actions taken against him, that a single patient has been deprived of her first choice of a physician, and has not shown that interstate funds or trade has been substantially affected by the fact that he no longer has staff privileges at two hospitals. The antitrust laws, having been drafted to protect the public, and not the competitor, Plaintiff must meet this burden of proof at trial.

At this stage of the litigation, I will not assume as a matter of law that he will be unable to do so.

■ Plaintiff's Section 2 charges, that Defendants conspired to monopolize and/or attempted to monopolize a part of trade or commerce is an actionable wrong whenever a restraint of trade or monopolistic practice has an impact on the market, and it matters not that the complainant may be only one merchant. *Wurzberg Brothers, Inc. v. Head Ski Company*, 276 F.Supp. 142 (D.N.J. 1967). Regulated industries are not per se excluded from Section 2 of the Act. *Marnell v. United Parcel Service of America, Inc.*, 260 F.Supp. 391 (N.D.Cal.1966).

■ The offense of monopolization requires monopoly power. *Lamb Enterprises, supra*. It is defined as the power to control prices or exclude competition. *U.S. v. E.I. DuPont de Nemours & Company*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). *Granader v. Public Bank*, 281 F.Supp. 120, aff'd 417 F.2d 75 cert. den. 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686 (1967).

■ Monopoly power that is the consequence of a superior product, business acumen, or historic accident, is not an offense under this section. *Marnell v. United Parcel Service of America, supra*. Any use of monopoly power to increase and further power or to maintain it when those actions are not inevitable but are consciously done to increase or preserve power, constitutes monopolizing. *Bergjans Farm Dairy Company v. Sanitary Milk Producers*, 241 F.Supp. 476, aff'd 368 F.2d 679 (1965).

Defendants and Plaintiff disagree about the definition of monopoly power. Defendants claim that they don't compete in the relevant market, i.e. the practice of general or family medicine, and do not have the ability either collectively or individually to control the market. While most courts have held that a high market share is necessary to support a finding of conspiracy under Section 2, *United States v. Aluminum Company of America*, 148 F.2d 416 (CA 2 1945), there is no rigid rule requiring a specific percent of the market. See *Yoder Brothers, Inc. v. California-Florida Plant Corporation*, 537 F.2d 1347, cert. den. 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1976). Because Plaintiff has alleged that

Defendant hospitals have unique services, and because a partial restraint of trade or control of a submarket under some circumstances, may constitute a violation under the antitrust laws, final determination of the underlying basis for Plaintiff's allegations concerning probability of success must await further proof. *ILC Peripherals Leasing Corporation v. International Business Machines Corporation*, 458 F.Supp. 423 (N.D.Cal.1978). Defendants contend that the hospitals' market share is not relevant to the Section 2 claim although it may be relevant to Section 1 claims which they argue fail for other reasons. As the reasonable substitution of services or products is a major factor in evaluating the relevant market or submarket, Plaintiff must produce evidence at trial that there is indeed a relationship to support the Section 2 claim.

While both Plaintiff and Defendants agree that specific intent is a prerequisite to a Section 2 violation for either conspiracy or attempt to monopolize, they disagree about whether this section mandates a substantial probability of success under the conspiracy theory. Plaintiff claims that the Sixth Circuit has shown the inclination not to require it. See *Alles Corporation v. Senco Products, Inc.*, 329 F.2d 567 (CA 6 1964).

I find that Plaintiff's reliance on *Senco* is misplaced. While the Court reversed the District Court's dismissal of the complaint, it did acknowledge the element of a dangerous probability of success.

> ... where acts are not sufficient in themselves to constitute a monopoly but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Id.* at 572.

■■ Specific intent, though necessary, is not enough to support a Section 2 claim either for conspiracy or attempt to monopolize. At the bare minimum, the premise for a conspiracy to monopolize claim must include (1) the existence of a combination or conspiracy; (2) overt acts done in furtherance of the conspiracy; (3)

an effect on a substantial amount of interstate commerce; and (4) the existence of specific intent to monopolize. *Cullum Elec. & Mechanical, Inc. v. Mechanical Contractors Association of South Carolina*, 436 F.Supp. 418 aff'd 569 F.2d 821 (CA 4 1978) cert. den. 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978). The majority of the case law includes the dangerous probability of success requirement in the attempt to monopolize claim. An attempt to monopolize claim must show the following elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; (3) a dangerous probability of success. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830 (1980). There are exceptions:

> In the case of an alleged attempt to monopolize, it is generally necessary to establish the relevant product market and a dangerous probability of success; but such considerations become less important as aggressive predatory intent and conduct emerge more clearly. *Telex Corporation v. International Business Machines*, 367 F.Supp. 258, rev'd on other grounds 510 F.2d 894, cert. dismissed 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1973).

The Court in *Telex Corporation v. International Business Machines* went on to say that where predatory action of an alleged monopolist is selective and focused, and its anticompetitive effects are shunted away from a more general market, corresponding submarkets should be more readily recognized in determining the existence and exercise of monopoly power. Because of the treble damage provision of the Sherman Act, I am inclined to treat the dangerous probability of success element as a requirement. However, at this point, I invite the parties to brief the issue further.

■■ Defendants contend that Plaintiff does not have standing to sue because he did not do business as an individual and there has been no showing that the professional corporation of which Williams was a stockholder was damaged by his loss of privileges. To maintain an action for treble

damages, a person must be "injured in his business or property by reason of anything forbidden in the antitrust laws." If a party is injured only indirectly or incidently he may not maintain the action. *Kauffman v. Dreyfus Fund*, 434 F.2d 727 (CA 3 1970) cert. den. 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1970). Utilizing the concept of direct as opposed to indirect injury, many courts, as Defendants have pointed out, have ruled that stockholders may not sue as the corporation has been the entity that has been directly injured. I find that the "target area" test is appropriate to this action. See *Stickells, Antitrust Laws* § 187 (1972). Regardless of the general rule, there are exceptions which the Court must consider. Target area is defined as the area "which it could reasonably be foreseen would be affected by the anti-trust violation." *Hoopes v. Union Oil Company*, 374 F.2d 480 (CA 9 1967). It is well established that a violation of the antitrust laws must be the proximate cause of the injury to the Plaintiff in order for the Plaintiff to recover treble damages. *Virtue v. Creamery Package Manufacturing Company*, 227 U.S. 8, 33 S.Ct. 202, 57 L.Ed. 393 (1913). Consequently, I find that Plaintiff has standing to sue as it was reasonably foreseeable that he personally would be affected although the evidence may later show that the economic injury that he alleges has not been proximately caused by Defendants' actions.

In denying Defendants' request for summary judgment, it is not my purpose to make it more difficult for those who perform a statutory duty to assure that physicians given staff privileges in a health delivery institution meet accepted medical standards or to indicate that the antitrust laws provide a federal forum whenever a disgruntled physician is unhappy with the rules established as a condition for maintaining staff privileges. Rather, because the record at this time is incomplete, and because there are still some unanswered questions about the utilization of paramedi-

cal personnel as it influenced Defendants' perception of Plaintiff's qualifications and performance, and because there exists the possibility, at least, that Plaintiff was competing for a shrinking health dollar, I feel that a fuller exploration of the facts is merited. Accordingly, Defendants' Motion for Summary Judgment is denied.