465 So.2d 1246 (1985)
Robert E. HACKETT, M.D. and Robert E. Hackett, M.D., P.A., Appellants,
v.
METROPOLITAN GENERAL HOSPITAL, a Florida Corporation, Appellee.
No. 84-523.
District Court of Appeal of Florida, Second District.
January 30, 1985.
Rehearing Denied March 22, 1985.
*1248 William C. Ballard of Fisher & Sauls, P.A., St. Petersburg, for appellants.
Charlie Luckie, Jr. of Dayton, Sumner, Luckie & McKnight, P.A., Dade City, for appellee.
LEHAN, Judge.

I. Summary of Issues, Facts and Holding

In this antitrust case plaintiff, a doctor, appeals from a final judgment determining after a nonjury trial that no violation of section 542.18, Florida Statutes (1981) (the counterpart of section 1 of the Sherman Act) was established from the refusal by defendant, a hospital, to grant staff privileges at the hospital to plaintiff. We affirm.
The sufficiency of the complaint was established in Hackett v. Metropolitan General Hospital, 422 So.2d 986 (Fla. 2d DCA 1982). Plaintiff, who is a medical doctor specializing in urology, contended that he was refused staff privileges at the hospital "by reason of a conspiracy between the hospital through its board of trustees and the osteopathic physicians on the staff to perpetuate a monopoly for the one staff member practicing urology and to limit the staff to osteopathic physicians, thereby insulating them from competition by medical doctors." Id. at 987. He also contended that there was a violation of section 395.0653, Florida Statutes (1981), prohibiting hospitals from refusing staff privileges to a physician on the sole basis of whether the physician is licensed as a doctor of medicine or a doctor of osteopathy. The trial court disagreed with his contentions and denied his request for an injunction requiring his admission to the staff. His appeal addresses only the antitrust contentions.[1]
*1249 Plaintiff's application for staff privileges at the hospital was rejected by the hospital's staff and by the hospital's board of trustees. He was advised that the basis for his rejection was that the hospital already had adequate urology coverage. There was testimony that the hospital had received no complaints about inadequate urology services. He then contacted the office of Hospital Licensure and Regulation of the Florida Department of Health and Rehabilitative Services (HRS) and a newspaper reporter who had been writing a series of articles on hospital staff privileges, claiming that he had been unlawfully excluded from the staff. Thereafter he followed further procedures under the hospital's bylaws and appeared successively before the Executive Committee of the staff and the Board of Trustees, each of which rejected his application. The board then gave as its basis that plaintiff "would be a disruptive force on the staff." That latter basis for the rejection appears to have derived from plaintiff's actions in contacting HRS and the newspaper, complaining of his rejection. The hospital contends that plaintiff had a lawyer and knew or should have known at the time he contacted HRS and the newspaper that further procedures were available to him under the bylaws. Plaintiff contends he was unaware of those procedures and had been advised by the hospital, following his first rejection by the board, that the decision was final. Included within the evidence in this regard was evidence that prior to contacting HRS and the newspaper plaintiff had consulted his lawyer about his efforts to gain admittance to the hospital staff.
In its final judgment for the defendant the trial court disagreed with the hospital's initial basis for refusing staff privileges to plaintiff, finding that there was a need for a urologist with the qualifications of plaintiff at the hospital. Nonetheless, the trial court concluded that the board sincerely felt that the hospital's urology needs were being fulfilled and that the board was justified in finding that plaintiff would be a disruptive influence. The court found that the rejection of plaintiff's application was not based upon the fact that he was a medical doctor, noting that other medical doctors had been admitted to the staff. The court further found that the decision to deny plaintiff staff privileges was not based upon a desire to create a closed shop or to stifle competition.
Our reasoning for affirming the judgment for defendant can be summarized as follows: Although per se concepts of antitrust liability based upon the group boycott doctrine might on the surface seem to apply, we believe that doctrine is inapplicable here. It is inappropriate to strictly apply the group boycott doctrine, which was created with reference to commercial conduct, to determinations like those in this case involving the composition of a hospital's professional staff. Although there is authority stating that, to impose antitrust liability under the rule of reason, a showing of either anticompetitive purpose or unreasonable anticompetitive effect is sufficient, we believe that in a case like this there should not be liability without a clear showing that the dominant purpose of excluding a physician from a hospital's staff was anticompetitive. We conclude that the record does not establish the existence of a dominant anticompetitive purpose in the decision to exclude plaintiff in this case. In any event, even if a showing of unreasonable anticompetitive effect alone were sufficient to establish a rule of reason violation, *1250 we conclude that the record does not establish an unreasonable restraint on competition in the relevant market.
That reasoning is further explained below.

II. Background

This type of lawsuit has originated only in recent years. The genesis apparently was Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), to the effect that the learned professions are not exempt from the antitrust laws. In Goldfarb the Supreme Court in a footnote nonetheless indicated that certain practices on the part of those engaged in professions might be lawful even though the same practices would be unlawful in a commercial context:
The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.
Id., 421 U.S. at 788-89 n. 17, 95 S.Ct. at 2013 n. 17, 44 L.Ed.2d at 585. Yet in National Society of Professional Engineers v. United States, 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637, 653 (1978), the Supreme Court said that the foregoing footnote from Goldfarb "cannot be read as fashioning a broad exemption under the Rule of Reason for learned professions." Thereafter the Supreme Court in Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), also foreclosed any notion that there was any sort of absolute shield to the learned professions from per se antitrust liability. In Maricopa County, which unlike the instant case involved price-fixing, the Supreme Court said that the court was
unpersuaded by the argument that we should not apply the per se rule in this case because the judiciary has little antitrust experience in the health care industry. The argument quite obviously is inconsistent with [United States v.] Socony-Vacuum [Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129]. In unequivocal terms, we stated that, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."... [T]he argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable  an inquiry so often wholly fruitless when undertaken."
457 U.S. at 349-50, 102 S.Ct. at 2476-77, 73 L.Ed.2d at 62-63 (footnotes omitted).
Maricopa County, as did the Supreme Court's earlier opinion in Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), involved jurisdiction under the antitrust laws over allegations concerning the health care industry. As this court has held in its above referenced earlier opinion in this case, there is no jurisdictional impediment to this suit.
Striking changes in the law were signaled by Goldfarb, Hospital Building Co., National Society of Professional Engineers, and Maricopa County. But the U.S. Supreme Court in those cases provided few, if any, guidelines for finally deciding cases like that before us which involve the *1251 learned professions but do not involve price-fixing. The recent case of Jefferson Parish Hospital District No. 2 v. Hyde, ___ U.S. ___, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), in which the U.S. Supreme Court determined, under the facts of that case, that there was no unlawful tying arrangement in violation of the antitrust laws from a contract between a hospital and a firm of anesthesiologists which provided for the exclusive services of that firm at that hospital also does not control the case at hand. Nonetheless, Jefferson Parish, as noted further below, does seem to provide some additional insight into the Supreme Court's inclinations as to antitrust implications of doctors' relationships with hospitals.
The case before us involves a number of aspects which are peculiar to the antitrust field. References to two other, relatively detailed discussions provide explanations of some of these aspects. For an extensive analysis of the ramifications of applying traditional antitrust concepts to decisions by hospitals to deny staff privileges to physicians, see Kissam, Webber, Bigus & Holzgraefe, Antitrust and Hospital Privileges: Testing the Conventional Wisdom, 70 Cal.L.Rev. 595 (1982). For descriptions of basic concepts underlying rule of reason and per se types of antitrust violations, including the type of per se violation called a "group boycott" which might on the surface seem to be involved here, as well as the relationship between the federal antitrust laws and the Florida Antitrust Act of 1980 and our views as to some extensions of antitrust principles being ill conceived, see St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028, 1031, 1032, 1037-38, 1040, 1042 (Fla. 2d DCA 1984).

III. Reasoning

Since our approach to this case does not entirely conform to all traditional antitrust principles applied in commercial cases and in light of the increasing numbers of lawsuits of this type in recent years, Kissam, supra, at 596, we feel we should explain our reasoning in some depth. This is also in recognition, as noted above, that the U.S. Supreme Court, when opening this area to antitrust litigation, provided few concrete guidelines for the ultimate resolution of cases like this. We should particularly recognize that the discussion in the above-referenced California Law Review article is profound and thought provoking, whether or not one is in agreement with all views expressed in that article.

A. All Traditional Commercial Antitrust Concepts Should Not Control a Case Like This Which Involves the Quality and Efficiency of Medical Services

In the final analysis, resolution of disputes of this type must center largely upon decisions concerning the quality or efficiency of professional health care services. We feel those decisions usually are best left to members of those professions, absent more clearcut antitrust ramifications of the type involved, for example, in Goldfarb and Professional Engineers (price-fixing) and purportedly involved in Jefferson Parish (tying arrangements). We agree with the foregoing law review article that hospital staff decisions on the admission of doctors "typically will involve quality determinations by and about professionals that appear to have a substantially different nature than professional pricing choices." Kissam, supra, at 615.
Although we realize that plaintiff's medical skills were not questioned in this case and that the purpose of the rejection of plaintiff was, according to the trial court's findings, related to a lack of need for plaintiff's specialty at the hospital and plaintiff's perceived disrupting influence, cases involving a rejection of a physician's application to a hospital staff on the basis of an appraisal of the doctor's competence are not irrelevant. Those cases, like the present case, involve subjective decision-making. The court in Williams v. Kleaveland, 534 F. Supp. 912 (W.D.Mich. 1981), observed that
the determination of the medical competence of a physician is peculiarly within the domain of the medical profession. Although members of the public in general *1252 and of other professions, in particular, may effectively ascertain the effects of ethical codes prohibiting advertising, the establishment of fees, and other conduct which essentially concerns the economic aspects of the profession, it is my view that physicians themselves are best able to evaluate the competence and skill of another physician and to take appropriate action in the public interest.
Id. at 918-19. Those comments could apply to the types of determinations involved here relating to the needs of the hospital and the desired relationship between a doctor and others at the hospital. There may well be a legitimate concern with what the law review article suggests could, if traditional commercial antitrust concepts were strictly applied to this type of case, "turn antitrust courts and hospital attorneys into public utility regulators with the power to make these decisions for hospitals." Kissam, supra, at 603.
The U.S. Supreme Court referred recently to a "hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges." Jefferson Parish, ___ U.S. at ___, 104 S.Ct. at 1568, 80 L.Ed.2d at 24.[2] The Supreme Court also recognized that the effect at a hospital upon the quality of medical services of particular conduct which is claimed to constitute an antitrust violation is a relevant consideration in determining the legality of that conduct. See Jefferson Parish, ___ U.S. at ___, n. 52, 104 S.Ct. at 1568, n. 52, 80 L.Ed.2d at 24, n. 52. An arrangement "that has little anticompetitive effect and achieves substantial benefits in the provision of care to patients, is hardly one that the antitrust law should condemn." Jefferson Parish, ___ U.S. at ___, 104 S.Ct. at 1575, 80 L.Ed.2d at 33 (O'Conner, J., Concurring).
A physician's role in society depends more upon subjective, ethics-oriented factors, such as physical and mental skills and basic caring, than the more objective economic concepts which govern the commercial marketplace. Therefore, we believe the antitrust laws should be applied to physicians with circumspection.
The legal resolution of matters like this involving hospital staffing decisions involves a balancing of competing interests. We feel that the interests of society in the efficiency and quality of health care can best be served by not disturbing a hospital staff decision like that before us in this case and that those interests counterbalance any economic desirability of imposing all commercial standards of competition upon health care decisions of the type involved here. We do not believe that the U.S. Supreme Court, by saying that the learned professions are not exempt from the antitrust laws, meant to require a finding of antitrust liability in a case like this.
Plaintiff argues that the decision to exclude him from the hospital staff involved economic motivations to protect the income of the existing staff. It is a rather self-evident truth that some physicians may receive economic benefit from circumspect antitrust enforcement in this field. But that in itself does not provide to us under the facts of this case sufficient cause to make the courts, through the application of commercial antitrust principles, controlling participants in subjective decision-making processes concerning the composition of a hospital staff.
Every appropriate application of conventional antitrust principles to the health care industry must account for great dissimilarities between the present day health care sector and the traditional commercial context in which classical antitrust doctrines developed. Because of the professional, social, and economic complexities of health care delivery, physicians and hospitals cannot be held to *1253 the same pro-competitive rules as the makers of cellophane and aluminum; our society is willing to tolerate large-scale production and consumption of cut-rate aluminum and cellophane, but is unwilling to tolerate the large-scale production and consumption of substandard health care services. Additionally, application of "rules of the marketplace" assumes that consumers can balance quality against cost, a dubious assumption in the context of health care.... Before the courts attempt to coerce health care providers into more competitive modes of behavior, they should be reasonably certain that more competitive behavior not only is possible, but is desirable as well.
7 Am.J. of Law & Medicine, vol. 1, 1981, at iii, as quoted in Williams v. Kleaveland, 534 F. Supp. at 919.
Two recent federal district court cases involving facts somewhat similar to the facts of this case reflect an unwillingness to apply commercial antitrust principles to hospital staffing decisions. Notwithstanding appellant's cogent arguments, we share that unwillingness under the facts of this case. In Pontius v. Children's Hospital, 552 F. Supp. 1352 (W.D.Pa. 1982), the court found no antitrust liability from the decision to not reappoint a cardiovascular surgeon to a hospital's medical staff. In McElhinney v. Medical Protective Co., 549 F. Supp. 121 (E.D.Ky. 1982), the court directed a verdict for a hospital in a surgeon's suit claiming wrongful exclusion from the hospital's medical staff.
The opinion in Pontius contains a thoughtful analysis of whether basic antitrust concepts should be fully applied to hospital staffing decisions. The Pontius opinion was authored by the same federal district judge, Judge Cohill, who authored Robinson v. Magovern, 521 F. Supp. 842 (W.D.Pa. 1981), aff'd mem., 688 F.2d 824 (3d Cir.1982), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982), which is relied upon to a substantial extent by appellant. The following portions of the Pontius opinion exemplify the court's reasoning:
(1) That commercial antitrust concepts may apply to principally commercial aspects of the health care industry does not justify complete application of those concepts to professional aspects of that industry. See 552 F. Supp. at 1365.
(2) The group boycott doctrine of per se antitrust liability is not applicable to group decisions which involve ethical norms of physicians, such as, hospital staffing decisions. See 552 F. Supp. at 1369-70.
(3) Antitrust concepts relative to trade associations are not applicable to decisions of groups of physicians based upon subjective criteria as to the composition of a hospital's staff. See 552 F. Supp. at 1371.
(4) Unless the reasons for denying hospital staff privileges to a physician are motivated by anticompetitive purposes, the denial should not result in liability under section 1 of the Sherman Act.
In Robinson v. Magovern, 521 F. Supp. 842, [I] conducted a bench trial of some months, following which [my] major conclusion as to the section 1 claims asserted by [plaintiff] was that the hospital's decision not to grant him staff privileges was reasonable. In reaching that conclusion [I] acted on the implicit premise that if a hospital's stated reasons for denying the privilege did not implicate antitrust concerns and such reasons were supported by substantial evidence, no section 1 violation existed because the restraint was reasonable... . [I] believe this to be a proper legal rule. [I] do not believe that the Sherman Act prevents a hospital from discharging a physician it believes incompetent regardless of any collateral effect on "competition."
... .
It is important to note that a mere showing that the reasons advanced by the hospital are not supported by substantial evidence will not prove a plaintiff's case for him. Such a plaintiff will still have to prove that the hospital's decision was motivated by an anticompetitive reason rather than a legitimate one.
552 F. Supp. at 1372.
(5) Inability of a physician to cooperate with other physicians and staff members *1254 constitutes a legitimate reason for denying hospital staff privileges to the physician. See 552 F. Supp. at 1359, 1373.
(6) A hospital's legitimate, good faith reasons for its denial of hospital staff privileges to a physician need not have been logically correct in order to be a defense to a claim that the denial was an antitrust violation. See 552 F. Supp. at 1373, 1378.
There are distinctions which can be drawn between Pontius and the case at hand, but those distinctions are not significant for present purposes. For example, in Pontius plaintiff's staff privileges were not renewed, whereas in the case at hand plaintiff was refused staff privileges at the time of his first application. Also, in Pontius the court found that the hospital's reasons for denying staff privileges to plaintiff were supported by substantial evidence, whereas in the case at hand the trial court disagreed with one of the reasons  that adequate urology coverage at the hospital already existed  for the denial of staff privileges to plaintiff. However, as the Pontius opinion points out, as indicated in paragraphs (4) and (6) above, the invalidity of a hospital's board's reasons for denying staff privileges should not, ipso facto, establish antitrust liability. The decision to deny staff privileges should not be violative of section 1 of the Sherman Act, and accordingly, section 542.18 of the Florida Act, if it had a good faith, legitimate purpose. In this case the trial court specifically found that the board sincerely felt that the hospital's urology needs were being fulfilled and that there was no purpose to stifle competition. Also, the trial court found that the second basis for the board's decision to deny staff privileges to plaintiff  that he would be a disruptive influence  was supported by the evidence. As noted in paragraph (5) above, Pontius found this type of reason to be valid. We cannot say that the trial court in the case at hand had no adequate basis for its findings. See Tibbs v. State, 397 So.2d 1120 (Fla. 1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (appellate courts will not reweigh the evidence).
In McElhinney the court also rejected certain commercial antitrust principles and found either de minimis or no anticompetitive effect from a doctor's exclusion from a hospital staff.
Even assuming, however, that defendants' actions could be labelled a group boycott, the Court cannot find that they had such a potential for evil and harm to the relative competitive market for medical services and supplies so as to be classified as pernicious and without plausible redeeming virtues and thereby requiring imposition of the per se rule.
549 F. Supp. at 132.
Although plaintiff has shown a drastic drop in the number of surgeries done by him during the relevant time period, he has failed to adduce any evidence of the actual effect or impact that defendants' allegedly unlawful conduct had on the relative competitive market; i.e., on the rendering and receiving of medical services and supplies in the defined market area. There is no evidence of the probable effect on the relative competitive market.
549 F. Supp. at 135.

B. While Hospital Staffing Decisions Should Not Be Exempt From Antitrust Scrutiny, They Should Be Exempt From Antitrust Per Se Liability Concepts

We do not mean that we subscribe to a type of exemption of hospital staffing decisions from the Florida Antitrust Act of 1980. To the extent that Moles v. White, 336 So.2d 427 (Fla. 2d DCA 1976), may be construed to create an antitrust exemption under Florida antitrust law for hospitals and physicians, Moles no longer applies. The Florida Antitrust Act of 1980 in effect "adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act." St. Pete Yacht, 457 So.2d at 1032.
Also, we do not mean that hospitals may deal arbitrarily with decision-making of the type involved in this case. Appellant has made no procedural due process argument *1255 nor would the record appear to support such an argument.
We do mean, however, that we believe antitrust per se concepts of liability should not apply to the case at hand. See Pontius, 552 F. Supp. at 1369-70; McElhinney, 549 F. Supp. at 132. Cf. Boddicker v. Arizona State Dental Association, 549 F.2d 626, 632 (9th Cir.), cert. denied, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977). Plaintiff does not contend otherwise and limits his argument to the rule of reason.
The ethical norms of physicians, rather than relatively fixed rules of law, should be the principal influence upon decision-making of the type involved here. As noted in section III.A. above, the paramount public interest in, and frequent inability of consumers to readily perceive, high quality health care distinguish physicians' professions from the commercial fields from which most antitrust law has derived. Those norms impose public service obligations upon members of those professions. See Goldfarb, 421 U.S. at 788-89 n. 17, 95 S.Ct. at 2013-14 n. 17, 44 L.Ed.2d at 585 n. 17. We have no reason to conclude that the ethical norms of those professions do not serve their purposes for the professions as a whole.
In Professional Engineers the Supreme Court recognized that professional services may "differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary. Ethical norms may serve to regulate and promote this competition [among professionals] and thus fall within the Rule of Reason." 435 U.S. at 696, 98 S.Ct. at 1367, 55 L.Ed.2d at 653. In Jefferson Parish the Supreme Court again referred to "ethical norms" as presumably protecting the quality of medical services. See ___ U.S. at ___ n. 52, 104 S.Ct. at 1568 n. 52, 80 L.Ed.2d at 24 n. 52. Actually, "[m]ost hospital privilege decisions [e.g., hospital staff decisions to reject an applicant] probably can be characterized as `ethical norms' of the medical profession... ." Kissam, supra, at 646.
Accordingly, the antitrust analysis of a case of this type should be under the rule of reason.

C. Without a Dominant Anticompetitive Purpose the Decision to Exclude Plaintiff From Defendant's Staff Should Not Constitute an Antitrust Rule of Reason Violation

In considering the rule of reason we agree with the thrust of the Pontius opinion, quoted in section III.A.(4) above, that an anticompetitive purpose is a requisite for antitrust liability in a case like this. We go further and believe that the requisite is a dominant anticompetitive purpose which, as referred to further below, was not found to exist in this case. See Kissam, supra, at 660.
Our approach is consistent with the "purpose based approach" which is suggested by the foregoing article to resolve antitrust cases of this kind and which the authors believe would "promote important public policies" and yet at the same time "serve the central antitrust policies." Kissam, supra, at pp. 659-63, 670. "[P]roof that Defendants acted for the primary purpose of maintaining high quality patient care is a persuasive defense to an antitrust claim." Williams v. Kleaveland, 534 F. Supp. at 919.

D. The Evidence Does Not Require Reversing the Trial Court's Finding That the Purpose of Excluding Plaintiff From the Hospital's Staff Was Not Anticompetitive

The purposes which the trial court found the hospital had for rejecting plaintiff  good faith belief that there was no need for his services and the justified belief that he would be a disruptive influence  were, if supported by the evidence, related to the quality and efficiency of patient care at the hospital and were, therefore, not anticompetitive. Plaintiff argues that those purposes were not supported by the weight of *1256 the evidence and that therefore the trial court's findings in that regard constituted reversible error. We do not agree.
The basic question is not whether the hospital's beliefs were justified, e.g., whether, as the trial court found, the hospital was justified in believing that plaintiff would be a disruptive influence. The basic question is whether the hospital in good faith actually had that belief in forming its purpose to reject plaintiff's application. If the hospital had that belief, as was found by the trial court, that was evidence that the hospital's purpose was not anticompetitive. Also, if the courts in these kinds of cases closely scrutinize the reasons given by a hospital for excluding a doctor from the hospital's staff, there would be "inappropriate judicial interference with a hospital's managerial perogatives," and "subjective judgments to promote effective teamwork" in hospitals would be eliminated. Kissam, supra, at 650. In any event, plaintiff's burden was to prove dominant anticompetitive purpose. Even if, arguendo, plaintiff proved that the hospital's stated reasons were not justified and were not in good faith believed by the hospital, that in itself would not establish dominant anticompetitive purpose. The same considerations apply to the hospital's other reason  that the hospital's urology needs were already adequately met  which the trial court found to be unjustified but found to have been sincerely believed by the hospital.[3]
We conclude from our examination of the record that there was sufficient evidence to support the trial court's findings relative to the hospital's purposes in rejecting plaintiff and, most importantly, relative to the lack of an anticompetitive purpose on the part of the hospital.
We might concede, as counsel for plaintiff ably argues, that the record evidence that the hospital had the foregoing purposes for rejecting plaintiff is not particularly strong. However, even if that evidence were to be characterized as relatively sparse, that would not be grounds for reversal. Tibbs v. State, supra, does not limit to criminal cases its precept that appellate courts should not reweigh the evidence. Tibbs is authority in civil cases. See, e.g., Vecta Contract, Inc. v. Lynch, 444 So.2d 1093 (Fla. 4th DCA 1984). To conclude, as plaintiff argues, that the trial court was wrong would, we believe, necessarily require improper reweighing of the evidence.
Even in the event we were to say that the record in the case at hand contains substantial evidence that the hospital's decision had no relationship to quality or efficiency (or, as plaintiff also argues, that the weight of the evidence shows no such relationship) and that, therefore, the record *1257 evidence of an anticompetitive purpose (that plaintiff was rejected to protect existing staff members from competition which could reduce their incomes) appears, on balance, to have reflected the hospital's purpose, we would affirm. In those events we would, especially in light of the above considerations relating to subjective, state of mind decisions which involve the quality and efficiency of health care, apply Tibbs.
Plaintiff had the burden to show dominant anticompetitive purpose. The trial court saw and heard the witnesses. After weighing the evidence, the trial court found that the hospital board sincerely felt the hospital's urology needs were being fulfilled, that the board was justified in believing that plaintiff would be a disruptive influence, and that there was no anticompetitive purpose in denying plaintiff's application. The record does not justify a reversal of those findings.

E. Even if Antitrust Liability in This Case Could Exist Without Anticompetitive Purpose by the Hospital, No Unreasonable Anticompetitive Effect Was Established.

In any event, we do not conclude that the record establishes that the effect of the hospital's conduct was an unreasonable restraint in the relevant market. See Pontius, 552 F. Supp. at 1366-67, 1371. Cf. Jefferson Parish, ___ U.S. at ___-___, ___-___, 104 S.Ct. at 1555-56, 1566-68, 80 L.Ed.2d at 9-10, 22-25.[4] The antitrust laws are primarily for the protection of competition, not an individual competitor. See St. Pete Yacht, 457 So.2d at 1038, 1047. The fact that the exclusion of plaintiff in this case from the staff of one hospital caused him to practice medicine elsewhere does not establish an unreasonable restraint upon competition, especially where, as here, the evidence shows the availability of other hospitals in the area to plaintiff who, in fact, was on the staffs of four other hospitals. See Jefferson Parish, ___ U.S. at ___, 104 S.Ct. at 1568, 80 L.Ed.2d at 24.
It may well be true that the contract made it necessary for Dr. Hyde and others to practice elsewhere, rather than at East Jefferson [hospital]. But there has been no showing that the market as a whole has been affected at all by the contract. Indeed, as we previously noted, the record tells us very little about the market for the services of anesthesiologists.
Jefferson Parish, ___ U.S. at ___, 104 S.Ct. at 1568, 80 L.Ed.2d at 24. See also Justice O'Conner's concurring opinion in Jefferson Parish referring to the absence of the requisite effect upon competition being shown by an arrangement of a firm of four anesthesiologists "and one relatively small hospital." ___ U.S. at ___, 104 S.Ct. at 1576, 80 L.Ed.2d at 34.
We have no doubt that procompetitive effects exist from hospital staffing decisions which improve or prevent erosion of a hospital's efficiency of the quality of its services. Kissam, supra, at 646.
We find no merit in appellant's other argument that the trial court did not properly apply equitable principles.
Affirmed.
NOTES
[1] There is no issue before us involving discrimination against or differences between medical doctors and doctors of osteopathy. The Florida legislature has not treated the two types of doctors differently under the foregoing statute which establishes public policy regarding admissions to hospital staffs. The parties have, in effect, treated the two as competitive parts of one "product market" in the antitrust sense. We will, therefore, for present purposes not distinguish between them. When this opinion refers to physicians and physicians' ethics, those terms apply to both professions interchangeably. We deal simply with the rejection of a doctor's application for admission to a hospital staff and express no views whatsoever as to any similarities or differences between the two professions. Under these circumstances the antitrust ramifications involved would be no different concerning the admission of either type of physician to a hospital principally staffed with either type of physician.
[2] "As a matter of antitrust law, petitioners [the hospital] may give their anesthesiology business to [a particular doctor] because he is the best doctor available, because he is willing to work long hours, or because he is the son-in-law of the hospital administrator without violating the per se rule against tying." Jefferson Parish, ___ U.S. at ___ n. 41, 104 S.Ct. at 1565 n. 41, 80 L.Ed.2d at 21 n. 41.
[3] We have principally addressed in this opinion what in our view constitutes a defense to antitrust charges in this type of case. The other side of the coin would be what conduct in other cases of this type could justify the imposition of antitrust liability under section 542.18? The short answer is that, under our approach, anticompetitive purpose plus anticompetitive effect in the relevant market could constitute an antitrust violation. In that regard two other questions which we need not address in any detail in this case could conceivably exist from the use of this type of purpose-based approach. First, of what nature must be the anticompetitive effect in a particular market which, coupled with anticompetitive purpose, could result in antitrust liability? The law review article endorses the view that there should be no antitrust liability without anticompetitive purpose and substantial market power by the hospital. Kissam, supra, at 659. We believe that dominant anticompetitive purpose and the kind of unreasonable anticompetitive effect sufficient to impose liability in this kind of case under traditional commercial antitrust principles could bring about liability. Second, could an invalid, but good faith, purpose (like that which existed here under the trial court's findings relative to one purpose being that the hospital's urology needs were already fulfilled) be enough to shield a hospital from antitrust liability in this type of case even when serious anticompetitive effects exist? We are inclined to the view that even in those circumstances (which do not exist here) professional decision-making relative to the quality or efficiency of health care should not be subject to antitrust constraints and, therefore, impeded.
[4] The term "market" in the antitrust field may have different meanings and ramifications in different situations. See American Bar Ass'n, Section of Antitrust Law, Antitrust Law Developments 48-52 (1975); Antitrust Adviser §§ 3.24, 3.25, 3.26 (C. Hills 2d ed. 1978). To refer to the potentially multifaceted market aspects of the case at hand, it seems unnecessary to do more than to provide the foregoing citations to Pontius and Jefferson Parish. Jefferson Parish involved a purported tying arrangement resulting in the exclusion of a physician from a hospital medical staff. A necessary element of an unlawful tying arrangement under traditional antitrust concepts (which the Supreme Court found to have been not proved to exist in that case) is a not insubstantial effect upon competition. See Hyde v. Jefferson Parish Hospital District No. 2, 686 F.2d 286, 289 (5th Cir.1982). The Supreme Court's conclusions in that regard which we have cited in the text of this opinion are relevant to the same type of issue in this case. Portions of Jefferson Parish might be interpreted to reflect an implied disinclination to impose antitrust liability in this context.