637 F.2d 205
 1980-81 Trade Cases 63,687
 SCHOENKOPF, Richard, d/b/a "Vend-Mark"
v.
BROWN & WILLIAMSON TOBACCO CORPORATION and Loew's Theatres,
Inc. and R. J. Reynolds Tobacco Company, Richard
W. Schoenkopf, d/b/a "Vend-Mark",
Appellant in No. 80-1327,
R. J. Reynolds Tobacco Company, Appellant in No. 80-1328.
 No. 80-1327/8.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 16, 1980.
Decided Dec. 29, 1980.
Rehearing and Rehearing In Banc Denied Jan. 26, 1981.
 
 1
 Arnold Levin, Michael D. Fishbein (argued), Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for Richard Schoenkopf.
 
 
 2
 Charles C. Hileman, III, Peter S. Greenberg (argued), Carole E. Handler, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Brown & Williamson Tobacco Corp.
 
 
 3
 Franklin Poul (argued), Diane J. Sigmund, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Loew's Theatres, Inc.
 
 
 4
 John G. Harkins, Jr. (argued), Marjorie G. Marinoff, Richard M. Bernstein, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for R. J. Reynolds Tobacco Co., Thomas J. Rucker, Associate Counsel, Winston-Salem, N. C., of counsel.
 
 
 5
 Before GIBBONS and ROSENN, Circuit Judges and WEBER,* District Judge.
 
 OPINION OF THE COURT
 GIBBONS, Circuit Judge
 
 6
 Plaintiff, Richard Schoenkopf brought suit against R. J. Reynolds Tobacco Company (RJR), Brown & Williamson Tobacco Corporation (B & W), and Loew's Theatres, Inc. (Lorillard), alleging violations of the Sherman Act and the Robinson-Patman Act, and alleging breaches of contracts. Schoenkopf sought treble damages for the alleged Sherman Act violations, injunctive relief under the Robinson-Patman Act, and damages for his contractual claims. The case was tried before a jury. At the conclusion of plaintiff's evidence, the district court granted defendants' motions for directed verdicts with respect to the Sherman Act claims. By agreement of the parties, the jury was discharged, leaving the court to decide the remaining claims. The court found in favor of each defendant on the Robinson-Patman Act claims, and in favor of Schoenkopf against each defendant on the contract claims. Schoenkopf appeals the adverse judgments on the antitrust claims. RJR cross-appeals from the district court's judgment in his favor on the contract claim against it. We affirm.
 
 
 7
 The defendants are three of the six major tobacco companies which manufacture cigarettes in the United States.[1] Collectively, these companies manufacture over 100 different brands of cigarettes. Each markets its cigarettes, in part, by sales through vending machines. Because space in the vending machines is limited, each tobacco company offers a promotional allowance in an effort to induce vending machine operators to place its brands in their machines. A vending machine operator participating in such a promotional program might receive from each manufacturer approximately $1.50 to $15.00 a year for each machine. An operator can receive allowances from more than one company and, depending on the combination of brands placed in a machine, could receive allowances totalling as much as $39 a machine.
 
 
 8
 Explaining that small operators, typically owning only one or two vending machines located at their places of business, are often unaware and fail to take advantage of these promotional allowances, the district court described plaintiff's role:
 
 
 9
 The plaintiff, in the middle of 1976, started a company known as "Vend-Mark". The purpose of Vend-Mark was to act as an independent reporting agent for people who operated only a few vending machines and wished to participate in the promotional allowance programs offered by the tobacco companies. The plaintiff entered into agreements with each of the six major tobacco companies that basically provided that Vend-Mark would submit a promotional allowance report to the company at the end of each quarter which covered all of the machines of operators for whom the plaintiff was the reporting agent. The tobacco companies paid Vend-Mark directly for these reports, and the plaintiff, pursuant to the arrangements he had made with the small operators, remitted fifty percent of the payment covering their particular machine or machines to them.
 
 
 10
 Vend-Mark was successful and grew rapidly. By the end of the third quarter of 1977, Vend-Mark was reporting for 3,496 machines, and there were 5,520 machines for which Vend-Mark was reporting at the end of the first quarter of 1978. At the time of trial, Vend-Mark was reporting for approximately 4,200 machines.
 
 
 11
 483 F.Supp. 1185, 1188 (E.D.Pa.1980).
 
 
 12
 In December, 1977, B & W notified Schoenkopf that it was cancelling its contract with him because he was neither an owner nor an operator of vending machines, as it contended was contemplated by that company's contract. B & W and Schoenkopf unsuccessfully negotiated alternative arrangements until March 6, 1978 when B & W finalized its termination of plaintiff's contract. On March 31, 1978, Lorillard terminated Schoenkopf's reporting contract. RJR terminated his reporting agreement on May 1, 1978.
 
 I. Sherman Act Claims
 
 13
 Schoenkopf claims that the defendants' refusals to deal with him were the result of a conspiracy in violation of section 1 of the Sherman Act. In reviewing the directed verdict in favor of the defendants, we must consider the evidence in the light most favorable to the plaintiff. We agree, however, that Schoenkopf has produced no evidence from which a jury could reasonably infer that the defendants conspired in refusing to deal with him.
 
 
 14
 Section 1 of the Sherman Act prohibits only joint action; independent business decisions and actions cannot be the basis for a section 1 claim. See Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co., 513 F.2d 102, 108 (2d Cir. 1975), citing Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966). Because of the difficulty in proving an antitrust agreement, especially where there are only a few companies participating in the trade, circumstantial evidence "aid(s) in demonstrating the existence of sophisticated and silent agreements which so often have injuriously restrained trade." Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199, 202 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962). The courts have recognized that consciously parallel business behavior, when coupled with other circumstances, supports an inference of agreement. See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954).
 
 
 15
 To establish consciously parallel behavior, a plaintiff must show (1) that the defendants' business behavior was parallel, and (2) that the defendants were conscious of each other's conduct and that their awareness was an element in their decisional process. Plaintiff Schoenkopf has introduced evidence that, despite B & W's earlier indication of its intent to cancel, and the companies' varying purported reasons for so acting, actual termination of his business relationship with each of the defendants occurred within several months following more than a year of his dealing with these companies. Schoenkopf also offered uncontradicted evidence that the defendants' representatives had attended a trade show of the National Automatic Merchandising Association in Chicago between October 12, 1977 and October 16, 1977. Although this court has previously noted that a mere showing of opportunity for conspiracy, without more, is insufficient to support an inference of consciously parallel action, the added facts that B & W, Lorillard, and RJR each terminated their reporting agreements with the plaintiff on March 6, 1978, March 31, 1978, and May 1, 1978 respectively permits an inference that the opportunity had been taken advantage of. Cf. Venzie Corp. v. United States Mineral Products Co., Inc., 521 F.2d 1309, 1313 (3d Cir. 1975). This evidence, although certainly not overwhelming, is sufficient to support an inference that defendants' conduct was consciously parallel. For purposes of reviewing the directed verdict, defendants' denials and explanations cannot be considered.
 
 
 16
 Conscious parallelism, albeit some indication of a "silent agreement," is in itself, however, insufficient circumstantial evidence from which to infer an antitrust violation. See, e. g., Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., supra; Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). As we have recently held, before such an inference may be drawn a plaintiff must also show (1) that the defendants acted in contradiction of their economic interests, and (2) that the defendants had a motive to enter into an agreement. Venzie Corp. v. United States Mineral Products Co., Inc., supra, 521 F.2d at 1314, citing First National Bank v. Cities Service Co., 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569 (1968); Delaware Valley Marine Supply Co. v. American Tobacco Co., supra. Absent such additional evidence a directed verdict or a judgment notwithstanding the verdict should be granted.
 
 
 17
 Asserting that the defendants' independent business justifications for terminating business relations with him were a "sham," Schoenkopf argues that the defendants acted contrary to their individual self-interest. He explains how his services filled a gap in the defendants' marketing programs, relieving the tobacco companies of the cost and administrative expense in locating and processing the reports of independent vending machine operators. The evidence of record, however, belies his theory. His services neither fulfilled the objectives of the promotional allowance programs nor benefitted the defendants. The purpose of the allowances was to encourage vendors to stock and display a particular company's brands. The tobacco companies benefitted only if the vendors recognized that the allowances directly corresponded to their promotion of the company's cigarettes. For this recognition, the tobacco companies depended on personal contact with and direct payment to the vendor. Schoenkopf conceded that his methods of accounting to the independent vendors for whom he reported allowed no such correlation. Thus a jury could not infer that the defendants' insistence on direct dealing was in contradiction of their economic self-interest.
 
 
 18
 Schoenkopf further asserts that because of the competitive market with respect to brand placement in vending machines the defendants were motivated to agree prior to their individual refusals to deal with him. He argues that because of the impact his services had on the tobacco companies' influence over the independent dealers no one company would pull out unilaterally and leave the field for those willing to deal with him. But Schoenkopf presented no evidence in support of this theory, and, in fact, the record evidence defeats his argument. By his own admission, Schoenkopf did not promote one company's brands over another's. His method of distributing the allowances in yearly lump sums compositing several companies' payments ensured that the vendors' display of cigarettes would remain unaffected by the allowance. Thus the unilateral withdrawal of one tobacco company could have no competitive repercussions in the market.
 
 
 19
 Schoenkopf also hypothesizes that the defendants must have anticipated burdensome promotional allowance outlays to the independent vendors as Vend-Mark's business expanded. There was, however, no evidence offered in support of a theory that any company had any interest in limiting promotional allowances which would actually serve to promote sales. They had a common interest in not doing business with him because his method of distributing the allowances failed to identify the source. This, however, was parallel action consistent with rather than in contradiction of each defendant's economic interest.
 
 
 20
 Schoenkopf argues that this court should not be overly rigid in requiring a showing of activity contrary to economic interest before an inference of concert of action in violation of the Sherman Act may be drawn. We can envision other factors which might, when coupled with consciously parallel behavior, support such an inference. Schoenkopf, however, has shown none. In Bogosian v. Gulf Oil Corp., supra, we held that the plaintiff had sufficiently alleged a section 1 Sherman Act violation and we allowed him the opportunity to prove his theory circumstantially. 561 F.2d at 446-47. Here, however, having been given the opportunity, Schoenkopf has failed to present sufficient circumstantial evidence from which a jury might reasonably infer that the defendants had conspired in refusing to deal with him.
 
 II. Robinson-Patman Claims
 
 21
 Section 2(d) of the Robinson-Patman Act prohibits a supplier from paying allowances for advertising or other sales promotion services or facilities provided by one customer who resells the supplier's products unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products."[2] Schoenkopf alleges that the defendants violated section 2(d) of the Robinson-Patman Act because they failed to offer merchandising promotional allowances to all cigarette vending machine operators. He accuses the tobacco companies of failing "to take steps to communicate the existence and availability of their display plans to independent vendors competing with professional vendors for sales of cigarettes." Appellant's brief at 35. His theory is that once he showed that the defendants in fact offered promotional allowances to customers, the burden of proof shifted to them to prove that such allowances were made available to all of their competing customers.
 
 
 22
 In rejecting Schoenkopf's claim for injunctive relief against Robinson-Patman Act violations the trial court ruled (1) that he lacked standing, and (2) that, assuming standing, he presented no evidence of a section 2(d) violation. Because we agree with the court's ruling on Schoenkopf's standing to seek injunctive relief, we do not reach the question whether his evidence established a prima facie case of a section 2(d) violation.[3]
 
 
 23
 Section 16 of the Clayton Act, authorizing suits for injunctive relief, provides in part:
 
 
 24
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.
 
 
 25
 15 U.S.C. § 26 (1976). As we have recently noted, unlike actions for treble damages, a claim for injunctive relief "does not present the countervailing considerations such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses that the Supreme Court emphasized when limiting the availability of treble damages." Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 590 (3d Cir. 1979) (footnote omitted). Accord, Hawaii v. Standard Oil Co., 405 U.S. 251, 261-62, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972); In re Multidistrict Vehicle Air Pollution, M.D.L. No. 31, 481 F.2d 122, 130-31 (9th Cir.), cert. denied sub nom. Morgan v. Automobile Manufacturers Association, Inc., 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). Section 16 is further distinguishable from section 4 in that it does not require that the injury already have been sustained, and does not require that the threatened harm be to plaintiff's "business or property." Mid-West Paper Products Co. v. Continental Group, Inc., supra, 596 F.2d at 591.
 
 
 26
 These distinctions, in light of the nature of injunctive relief, have prompted the courts to acknowledge a lower threshold standing requirement for section 16 than for section 4. See Bogus v. American Speech & Hearing Association, 582 F.2d 277, 288 (3d Cir. 1978), citing L. Sullivan, Antitrust 772 (1970). "Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4, ... and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy ...." Bogus v. American Speech & Hearing Association, supra, 582 F.2d at 288-89, citing Hawaii v. Standard Oil Co., supra, 405 U.S. at 260-61; Zenith Corp. v. Hazeltine, 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).
 
 
 27
 By acknowledging this lower threshold for injunctive relief, however, we do not extend a carte blanche to those unaffected and untouched by the substantive violation. Standing under section 16 is dependent on a showing of threatened loss or injury from the alleged antitrust violation. See Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1132 (5th Cir. 1975). Proximity between the plaintiff's injury and the antitrust violation, albeit necessary to a lesser degree, is still required. See, e. g., Mid-West Paper Products Co. v. Continental Group, Inc., supra, 596 F.2d at 591-92 & n.74, citing Jeffrey v. Southwestern Bell, supra, 518 F.2d at 1132. Our primary concern is that we have before us a plaintiff who adequately represents the interests of the "victims" of the antitrust violation. The existence of some causal nexus ensures that in fashioning relief we appropriately address and remedy the actual violation rather than simply correct an incidental injury. As noted by the Supreme Court in a damages case, but applicable here as well, plaintiff "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).
 
 
 28
 Plaintiff's injury in this case does not result from the unavailability to the small-scale cigarette vending machine operators of defendants' promotional allowances. In fact, we note that for as long as the defendants continued to deal with him, Schoenkopf actually benefitted from the defendants' presumably illegal practices. Had the promotional allowances been otherwise available to the independent operators, there would have been no need for plaintiff's business, at least in the form in which it developed. Plaintiff's injury results, instead, from the tobacco companies' insistence on directly dealing with the vending machine operators. Direct dealing, although perhaps aggravating the unavailability of the allowances to small vendors, is not itself a Robinson-Patman violation. We can only speculate that the cause of the small-scale operators' non-participation is the prohibitive cost of such participation with respect to the minimal returns per machine. It may be as well or even instead the tobacco companies' failure to effectively offer the plans by informing all vendors of their existence. The promotional allowance programs may be objectionable either in their large-scaled cost-benefit balance or in the fact that not all presumably competing customers are informed and aware of them. An injunction directed toward informing the operators would not help Schoenkopf, but might well be the only appropriate relief for the small vendors. The inappropriateness of Schoenkopf's supposed representation of the "victims" of the defendants' presumed antitrust violation is evidenced by the relief he has requested. His request that the defendants be enjoined to continue doing business with him on his terms is self-interested and, at best, only superficially addresses the problem. So, too, his request that the defendants be enjoined from insisting on directly dealing with all vendors is not necessarily in the vendors' interest. Although we acknowledge the need for representation of aggregated claims which would not otherwise be adjudicated, plaintiff's injury is not so proximately related to the alleged Robinson-Patman violation that he should be recognized as an appropriate section 16 plaintiff.
 
 III. Contract Claim
 
 29
 Lastly, Schoenkopf claimed that the three defendants each breached their contracts with him. Only RJR cross-appeals from the district court's adverse judgment. The district court's findings that the parties did not intend to limit their business relationship to reports of vending machines in the Philadelphia area are not clearly erroneous and the judgment is affirmed.
 
 
 
 *
 Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The other three tobacco companies are Philip Morris, Inc., The American Tobacco Company, and Liggett & Myers Tobacco Company
 
 
 [2]
 15 U.S.C. § 13(d) (1976). Section 2(d) provides:
 It shall be unlawful for any person engaged in commerce to pay or contact (sic) for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
 Id.
 
 
 [3]
 There is a serious question whether the independent vendors are competing customers within the meaning of the Robinson-Patman Act. See 16 C.F.R. § 240.3 (1980)