W. Thomas McELHINNEY, M.D., Plaintiff,

v.

The MEDICAL PROTECTIVE COMPANY, et al., Defendants.

Civ. A. No. 78–8.

United States District Court, E.D. Kentucky, Pikeville Division.

Sept. 21, 1982.

Gary L. Gardner, Gary L. Gardner & Associates, Louisville, Ky., John J. Getgey, Jr., White, Getgey & Meyer Co., LPA, Cincinnati, Ohio, for plaintiff.

John T. Ballantine, Ogden, Robertson & Marsahll, Louisville, Ky., for defendants Glenn Baird, M.D., Sylvan Golder, M.D., C.C. Hugan, M.D., Robert T. Longshore, M.D., and John H. Siehl, M.D.

Rufus Lisle, Harbison, Kessinger, Lisle & Bush, Lexington, Ky., for defendants The Medical Protective Co., Carl M. Brueggeman, M.D., Robert W. O'Conner, M.D., Robert G. Heimbrock, M.D., Leroy C. Hess, M.D., Richard J. Menke, M.D., Howard A. Herringer, M.D.

G. David Schiering, Thomas C. Hill, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant Campbell-Kenton County Medical Soc.

Edward J. Utz, Cincinnati, Ohio, for defendants George Hermann, M.D., and John Tcheng, M.D.

Roy W. Short, Edmund S. Lee, French, Short, Valleau & Bratton, Cincinnati, Ohio, for defendant Daniel M. Richfield, M.D.

William B. O'Neal, Howard F. Brietholle, Brietholle, Burdsall & Hancock, Cincinnati, Ohio, for defendant Herbert Francis, M.D.

James W. Gustin, Christopher J. Mehling, Gustin & Lawrence Co., LPA, Cincinnati, Ohio, for defendant Salvation Army.

## MEMORANDUM OPINION

UNTHANK, District Judge.

### PROCEDURAL BACKGROUND

Plaintiff, W. Thomas McElhinney, M.D., brought this action against Booth Memorial Hospital, the Medical Protective Insurance Company, the Kenton-Campbell County Medical Society, eighteen individually named doctors, and four "John Doe" defendants for alleged violations of the Sherman Act, Kentucky Statutes and common law. In pre-trial proceedings, the Court dismissed all but the Sherman Act claim. In addition, the Court dismissed four of the individually named defendants. The John Doe defendants are not before the Court for purposes of this ruling.

The issues of liability and damages were bifurcated, and trial on the issue of liability was held before a jury from August 3, 1982 to August 18, 1982. During the presentation of plaintiff's case, seven defendants, including the Medical Society and the Insurance Company, were dismissed by agreement of the parties. At the end of plaintiff's case, the ten remaining defendants moved pursuant to Fed.R.Civ.P. 50(a) for a directed verdict. After hearing argument thereon, the Court adjourned until August 24, 1982, at which time the Court directed a verdict for all remaining defendants.

## DESCRIPTION OF PARTIES

*Plaintiff*

Plaintiff, Dr. McElhinney, is a general surgeon licensed to practice medicine in Kentucky and several other states. He has been a member of the medical staff of Booth Hospital since 1950.

*Remaining Defendants*

Defendant Booth Hospital is a non-profit corporation operated by the Salvation Army. It was previously located in Covington, Kentucky, but is presently situated in Florence, Kentucky.

The other defendants are Dr. Herringer (specialist in internal medicine), Dr. Hess (family practitioner), Dr. Richfield (pathologist), Dr. Francis (radiologist), Dr. Baird (family practitioner), Dr. Longshore (family practitioner), Dr. Golder (general practitioner), Dr. Siehl (gynecologist), and Dr. Tcheng (anesthesiologist; now deceased).

## BACKGROUND FACTS

The dispute between plaintiff and defendants dates back at least a decade. Dr. McElhinney became critical of the medical practices and procedures of the other doctors at Booth Hospital, as well as of the procedures of the Hospital itself. These criticisms resulted in confrontations with the individual doctors and the local administration of Booth Hospital. Plaintiff contends that defendants perceived such criticisms as a threat to their respective practices because, he alleges, they viewed him as the instigator of medical malpractice lawsuits in the Northern Kentucky area. Dr. McElhinney further contends that as a result of defendants' concern about malpractice actions (and the higher insurance premiums occasioned by such actions), defendants conspired to rid themselves of him. More specifically, plaintiff alleges that as part of this conspiracy, defendants got together and decided to stop referring patients to plaintiff and to stop associating with him.

Defendants claim that any refusal to deal with plaintiff was the result of independent, unilateral acts, and was not, therefore, the result of a conspiracy.

## BRIEF SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

At trial, volumes of evidence concerning the criticisms exchanged between the parties were introduced. The evidence reflects the minutes of a series of meetings which were held by the various organizations of Booth Hospital beginning in January, 1973.[1] These minutes contain various complaints of both a professional and personal nature lodged by defendants against Dr. McElhinney. The evidence shows that the Board of Trustees of Booth Hospital was asked to investigate these complaints. The evidence also shows that on February 27, 1973, the medical staff voted not to reappoint plaintiff as a member of the Staff at Booth Hospital. The record reflects that on February 5, 1974, the Board of Trustees ordered the non-reappointment of plaintiff to the medical staff.

Dr. McElhinney sought and was granted injunctive relief at the state court level after the order of non-reappointment by the Board of Trustees. The proceedings in the state courts concluded with the Supreme Court of Kentucky reversing the judgment

1. A brief outline of the organizational structure of Booth Hospital follows. The Board of Trustees sat in New York City and was the only entity that could grant or withhold staff privileges. The Administrator of Booth Hospital, Major Glenn Seiler, answered and made recommendations to the Board of Trustees. The Advisory Council was composed of several committees, among which was the Medical Administration Committee, whose job included the handling of "medical and administrative problems." Next came the Medical Staff, which was in charge of medical events and served an advisory role to the Administrator and to the Board of Trustees. The right arm of the Medical Staff was the Executive Committee, which formalized matters to be brought before the general staff. This Committee was composed of doctors practicing at Booth Hospital. The Administrator, who attended the Executive Committee meetings, would transmit the minutes of these meetings to the Board of Trustees. It is the minutes of these meetings that comprise the bulk of the exhibits introduced at trial.

of the Kenton Circuit Court and ordering the reinstatement of Dr. McElhinney's staff privileges. Plaintiff filed this action on February 2, 1974.

## SUMMARY OF THE ISSUES

At the close of plaintiff's case, defendants moved for a directed verdict on the ground that there was insufficient evidence presented on which a jury could base a verdict finding a violation of section 1 of the Sherman Act. Specifically, the issues raised by the motion are as follows:

1. Whether the applicable statute of limitations bars this action;

2. Whether this Court lacks subject matter jurisdiction;

3. Whether there was a conspiracy in restraint of trade, or a boycott; and

4. Whether the *per se* rule or Rule of Reason applies in this action.

After hearing and reviewing the evidence presented, the Court finds:

1. That the statute of limitations does not bar this action.

2. That the Court has subject matter jurisdiction in this case.

3. That there was *prima facie* evidence of an agreement to effect a concerted refusal to deal and/or associate with plaintiff as to defendants Salvation Army, Dr. Hess, Dr. Herringer, and Dr. Richfield.

4. That there was no "group boycott" by the four defendants named in number 3 above.

5. In the alternative, the Court finds that even if the actions of defendants' in number 3 constituted a boycott, the Rule of Reason would apply in such case.

6. That there was insufficient evidence presented on the issue of actual restraint of trade under the Rule of Reason standard to survive the motion for a directed verdict as to the four defendants named in number 3 above.

7. That the motion for a directed verdict as to all defendants must be granted.

## STATUTE OF LIMITATIONS

■ Defendants contend that, even assuming there is a conspiracy, the statute of limitations bars plaintiff's claims. The applicable statute of limitations, found in 15 U.S.C.A. § 15b, provides:

Any action to enforce any cause of action under Section 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

The statute of limitations begins to run from the commission of the last overt act causing injury or damage. *Akron Presform Mold Company v. McNeil Corporation,* 496 F.2d 230, 233 (6th Cir. 1974); *Garelick v. Goerlich's Inc.,* 323 F.2d 854, 855 (6th Cir. 1963); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Because the complaint was filed on February 2, 1978, plaintiff's suit is barred if his cause of action accrued on or before February 1, 1974.

■ Defendants rely on *Garelick* for the proposition that a cause of action based on a refusal to deal accrues when a defendant first refuses to deal with a plaintiff. *Garelick, supra,* at 856. In view of the fact that defendants who presently refuse to deal with plaintiff first refused to deal with him prior to February 1, 1974, defendants contend that the statute bars this action. Plaintiff argues that the Board of Trustees' meeting on February 5, 1974, wherein it was finally resolved to not reappoint Dr. McElhinney to the Staff, constituted the last overt act causing damage. In the alternative, plaintiff argues that this case is a "continuing conspiracy", and therefore, more analogous to the situation involved in *Poster Exchange, Inc. v. National Screen Service, Corp.,* 517 F.2d 117 (5th Cir. 1975).[2]

---

2. The crux of *Poster* is that a reiteration of defendant's refusal to deal constitutes an "act within the meaning of *Zenith* . . . ." *Id.* at 127.

This view is reconcilable with *Garelick supra,* as the subsequent act must still cause damage. *Pioneer Co. Inc. v. Talon, Inc.,* 462 F.2d 1106,

Assuming there was a conspiracy resulting in damage to plaintiff's business, it is the Court's opinion that the last overt act causing such damage would have been the vote of non-reappointment by the Board of Trustees of the Salvation Army on February 5, 1974, four days prior to the running of the statute of limitations.

## JURISDICTION

Defendants contend that plaintiff has failed to lay the necessary foundation on which this Court may base jurisdiction.

 The broad reach of the Sherman Act extends not only to those activities that are "in" interstate commerce, but also to those wholly local activities that substantially "affect" interstate commerce. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). In this case, plaintiff argues that defendants' actions come within the "effect on commerce" test. Under this theory, plaintiff must show "either that defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." *Id.* at 242, 100 S.Ct. at 509. This standard has been interpreted as an expansion of the effect-on-commerce jurisdictional test because it requires proof of a nexus "merely between interstate commerce and defendant's general business activity rather than defendant's allegedly unlawful conduct." Note, *The Interstate Commerce Test for Jurisdiction in Sherman Act Cases and Its Substantive Applications,* 15 Ga.L.Rev. 714, 714 (1981).[3]

 Defendants contend that the focus is on whether defendants acts "substantially and directly" affected plaintiff's activities in interstate commerce. *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065, 1982–1 Trade Cas. ¶ 64,614 (E.D.Pa.1982). Defendants further argue that the important element in establishing jurisdiction is proving a nexus between defendants' unlawful acts and an effect on plaintiff's interstate activities. *Malini v. Singleton & Associates,* 516 F.Supp. 440, 443 (S.D.Tex.1981); *Nara v. American Dental Association,* 526 F.Supp. 452, 455 (W.D.Mich.1981). In deciding which standard to apply, the Court relies on the language of *McLain, supra.*

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient ... to demonstrate a substantial effect on interstate commerce generated by ... [defendants'] brokerage activity. [Plaintiff] need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of [defendants'] activity that are alleged to be unlawful.

*Id.* at 242–43, 100 S.Ct. at 509.

*McLain* clearly applies the broader "general business activities" test. This Court will do likewise. Therefore, the issue before the Court is whether the general business activities of Booth Hospital and the defendant physicians generate a substantial effect on interstate commerce. Plaintiff has introduced proof on this matter (see plaintiff's Exhibit Nos. 33 and 34) as follows:

1109 (8th Cir. 1972); *Imperial Point Colonnades Condominium v. Mangurian,* 549 F.2d 1029, 1035 (5th Cir. 1977). For an excellent analysis of the "continuing conspiracy" theory as it relates to the statute of limitations in anti-trust actions, see *Imperial, supra,* at 1033–42.

**3.** *Western Waste Serv. v. Universal Waste Control,* 616 F.2d 1094, 1097 (9th Cir.), *cert denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980); *Feldman v. Jackson Memorial Hosp.,* 509 F.Supp. 815, 819–21 (S.D.Fla.1981). The most recent law review on the subject rejects this broad reading of *McLain* on the ground that it would in essence eliminate the interstate commerce test from antitrust law since the total activities of virtually any defendant would have some effect upon interstate commerce. *Antitrust and Hospital Privileges,* 70 Calif.L.Rev. 595, 632–33 (1982). The Court notes that the test is whether there is "a not insubstantial effect" on interstate commerce, (*McLain, supra,* at 246, 100 S.Ct. at 511) and not whether there is "some effect". Accordingly, the Court cannot agree with this recent commentary, and accepts instead the interpretation given *McLain* by law review cited in the text above.

1. The admissions of Booth Hospital reveal an annual average since 1977 of $2,000,000.00 in Medicare benefits;

2. Treatment of patients travelling in interstate commerce;

3. Admission of over 25,000 out-of-state patients during the years 1974–78;

4. Seventy-eight percent (78%) of Booth Hospital's supplies and equipment was purchased from out-of-state vendors;

5. A significant number of physicians on the Staff at Booth Hospital practice outside Kentucky; and

6. Additions and improvements to Booth Hospital were federally funded.

In addition, plaintiff has shown that he treated a significant number of Medicare and Medicaid patients during the years in question, and that he derived a good deal of income from those federally-funded patients.

From the above evidence, and from other evidence introduced at trial as to the nature of the services rendered by defendants, the Court finds a sufficient nexus between defendants' general business activities of providing medical care, services, and supplies, and interstate commerce to establish subject matter jurisdiction. However, the Court stresses that this finding goes only to jurisdiction. The fact that defendants' general business activities have a not insubstantial effect upon interstate commerce in no way implies that the relative competitive market in interstate commerce has been adversely affected or unreasonably restrained. Adverseness or unreasonableness of effect is a substantive requirement in Rule of Reason cases, and, as will be discussed later, is one of the critical issues in this case.[4] In analyzing the reasonableness of the alleged restraint in this case, the

Court will apply the narrower test of the impact of defendants' "allegedly unlawful conduct" on the relative competitive market.[5]

## CONSPIRACY TO EFFECT A CONCERTED REFUSAL TO DEAL

[6] Dr. McElhinney claims that defendants' refusals to deal with him were concerted and the result of a conspiracy in violation of section 1 of the Sherman Act. In reviewing the motion for a directed verdict by defendants, the Court must consider the evidence in the light most favorable to plaintiff. The Court, having done so, finds *prima facie* evidence of an agreement to concertedly refuse to deal and/or associate with plaintiff as to defendants Booth Hospital, Dr. Hess, Dr. Herringer, and Dr. Richfield. The motion for a directed verdict must be sustained as to the other defendants.

■■ Section 1 of the Sherman Act prohibits only joint action; independent or unilateral business decisions cannot be the basis for a claim under section 1. *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 207 (3d Cir. 1980). Because it is often difficult to show an express agreement, circumstantial evidence may be used from which the jury may infer an agreement. *Id.* at 208.

■ Proof of conscious interdependent parallel acts, when coupled with other factors, is one way a jury may infer that defendants entered into an agreement or conspiracy in restraint of trade. *Id.; Theater Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954).

4. Were an unreasonable or adverse effect presumed from a showing of a not insubstantial effect upon interstate commerce, the Rule of Reason analysis would serve no purpose. The Court notes that while the Supreme Court has often used the phrase "substantial and adverse effect," it has done so when faced with a substantive rather than a ˙ jurisdictional attack. For a good discussion of the distinction be-

tween the substantive and jurisdictional element that have to be proved in a section 1 claim, see 15 Ga.L.Rev. 717–28 (1981).

5. This is the majority view for both jurisdictional and substantive purposes, but the basis for using the narrower test for jurisdictional purposes has been eroded by *McLain,* as discussed earlier in this opinion.

Under this theory, there are at least four elements that need to be proved. First, in order to establish consciously parallel behavior, plaintiff must show that defendants are conscious of each other's conduct and that said consciousness is an element in defendants' decision-making process. *Schoenkopf, supra,* at 208. However, conscious parallelism is insufficient in and of itself to infer an antitrust violation. *Id.; Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir. 1977), *cert. denied* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Before such an inference may be drawn, plaintiff must also show that defendants have acted against their economic self-interests and that defendants had a motive to enter into such an agreement. *Schoenkopf, supra,* at 208. A leading authority on antitrust law states that while conscious parallelism does not itself establish a violation of section 1, it is a factor to be weighed, and generally to be weighed heavily. P. Areeda, *Antitrust Analysis,* ¶ 325 at 372, 3d Ed. (1981); *see also, Morton Salt v. U.S.,* 235 F.2d 573, 577 (10th Cir. 1956). The existence of some other fact may allow the jury to transform parallelism into conspiracy and thus allow plaintiff to survive this directed verdict motion. These other facts are often referred to as "plus factors". Areeda, *supra,* at 371. Five such factors have been identified:

1. Indications of "traditional conspiracy"
2. Motive
3. Actions contrary to economic self-interests
4. Poor economic performance
5. Actions facilitating oligopolistic collaboration

*Id.* at 371–82.

The Court notes that the standard set out in *Schoenkopf* is expanded by the "plus factors" theory with the inclusion of three extra factors, but that the basic requirements of conscious parallelism plus some other factor remain essentially unchanged. Therefore, in analyzing the evidence in this case, proof by plaintiff in satisfaction of either standard will suffice to withstand the motion for directed verdict.

### Evidence of Parallel Behavior Generally

The evidence reflects that all defendants engaged in parallel behavior by attending, at one time or another, meetings wherein Dr. McElhinney was discussed. Plaintiff has shown that defendants attended meetings where charges were leveled against plaintiff and where it was voted to not recommend reappointment of plaintiff to the medical staff at Booth Hospital. The evidence also reflects various statements and acts of defendants that indicate parallelism. For the reasons set forth below, however, the Court finds *prima facie* evidence on the issue of an agreement to effect a concerted refusal to deal only as to Booth Hospital, and Drs. Hess, Herringer, and Richfield:

### Booth Hospital

The evidence reflects that not only did Booth Hospital's representative, Major Glenn Seiler, attend all the meetings concerning Dr. McElhinney, but that he also recommended, prior to any vote by the medical staff and without furnishing any reasons, that plaintiff not be reappointed to the Staff. In addition, the evidence contains various statements by Major Seiler that the decision boiled down to a question of losing the hospital or getting rid of Dr. McElhinney.

### Dr. Hess

The evidence reflects that Dr. Hess conducted meetings held at his home concerning plaintiff. Furthermore, Dr. Hess stopped referring patients to plaintiff in 1972. Finally, Dr. Hess attended several of the other meetings concerning Dr. McElhinney.

### Dr. Herringer

In addition to attending meetings wherein plaintiff was discussed, Dr. Herringer wrote Major Seiler that he [Herringer] would not relocate with the hospital if plaintiff were on the Staff. Dr. Herringer also refused to see any patients with whom Dr. McElhinney worked. He also presided at meetings where Dr. McElhinney's partic-

ipation in malpractice claims was discussed. Moreover, Dr. Herringer stopped referring patients to plaintiff, attended the meeting at Dr. Hess's home, and voted not to reappoint Dr. McElhinney even after the Supreme Court of Kentucky ordered reinstatement. Finally, the evidence reflects that Dr. Herringer wrote one patient and informed her that she would have to choose between Dr. McElhinney and himself.

### Dr. Richfield

The evidence shows that in addition to attending several meetings wherein the "McElhinney problem" was discussed, Dr. Richfield presented Booth Hospital and the medical staff with a coercive choice; i.e., they would have to choose between plaintiff and him. Moreover, the evidence reflects that Dr. Richfield thought it would be in the best interest of the hospital for Dr. McElhinney to leave the Staff, and that if he did not leave, everyone else would. Finally, the evidence reflects that Dr. Richfield may have been lax in his duty to examine specimens for Dr. McElhinney.

### Analysis

As to the four defendants above, the evidence of their attendance of meetings concerning Dr. McElhinney, their active participation in said meetings, the coercive choices presented, the refusals by Drs. Hess and Herringer to refer patients to plaintiff in the same time frame, the attendance of Drs. Hess and Herringer at rump meetings held at Dr. Hess's home, and Dr. Richfield's concurrent slowdown of examining specimens for Dr. McElhinney, together with the letters, statements, and acts of these four defendants, support an inference that their conduct was consciously parallel. For purposes of reviewing the directed verdict motion, defendants' denials and explanations cannot be considered. *Schoenkopf, supra,* at 208. The proximity of these defendants to each other at the hospital, the coincidence of their actions time-wise, and the nature of their activities

indicate that they were consciously aware of each other's actions in making their own decisions.

Thus, the remaining question is whether there is some other "plus factor" present to permit an inference of an agreement to effect a concerted refusal to deal and/or associate with Dr. McElhinney. The Court finds that the coercive choices given to Booth Hospital ("it's either him or me") by Dr. Herringer and Dr. Richfield may be construed to be declarations against economic interests for the simple reason that the doctors, by their ultimatums, placed themselves in the position of possibly losing their positions at Booth Hospital. Furthermore, the rump meetings at the house of Dr. Hess have rumblings of a traditional conspiracy. Finally, the actions by Drs. Hess and Herringer in terminating the referral of patients to Dr. McElhinney and, in the case of Dr. Richfield and Major Seiler, the slowing down of services in the hospital, all may be seen as actions facilitating oligopolistic collaboration, or, more precisely, evidence of a traditional conspiracy.

While the existence of other "plus factors" is tenuous, the Court finds that the evidence is sufficient to permit an inference by the jury of an agreement to effect a concerted refusal to deal with plaintiff as to Booth Hospital, Dr. Richfield, Dr. Hess, and Dr. Herringer.

### The Other Defendants

Although the Court feels that the actions (attendance at meetings, statements about malpractice actions, and voting) of the other defendants were parallel, plaintiff has failed to prove that same were consciously parallel or that those defendants acted against their economic self-interest or that they had a motive to enter into an agreement. Specifically, the Court notes that all the other defendants, except for Dr. Siehl, either never referred patients to Dr. McElhinney, or never stopped referring patients to him.[6] Accordingly, on the basis of the

---

6. The evidence reflects that Dr. Siehl attended two meetings in 1973, and that he quit referring patients to plaintiff in 1972 or 1973. Although his refusal to deal with plaintiff was concurrent with Drs. Hess' and Herringer's refusals to deal, the absence of other factors (existing in the case of Drs. Hess and Herringer) causes the Court to direct a verdict in favor of Dr. Siehl.

evidence presented, the Court must direct a verdict against plaintiff as to defendants Golder, Longshore, Baird, Tcheng, Francis, and Siehl on the issue of an agreement to effect a concerted refusal to deal with plaintiff.

## APPLICABILITY OF PER SE RULE

Plaintiff contends that the *per se* rule should apply in this case because, he alleges, this is a "group boycott" and group boycotts comprise one of the categories traditionally analyzed under the *per se* rule. *Klor's Incorporated v. Broadway-Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Defendants argue that this case must be analyzed under the Rule of Reason because 1) the courts have not had sufficient experience with this type of situation, and 2) the challenged acts are of a professional nature.

For the reasons stated below, the Court holds that the Rule of Reason governs this case.

*Background of the Two Rules*

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. However, the Supreme Court recognized that every trade agreement restrains trade to some degree, and decided that only unreasonable agreements in restraint of trade are illegal. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 834 (1911). Since *Standard Oil,* the Supreme Court has analyzed most restraints under the Rule of Reason. The determination required by the Rule of Reason is whether "under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Society,* —— U.S. ——, ——, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). However, determining the competitive significance of a restraint proved time-consuming and expensive for the courts. In an effort to improve judicial economy and efficiency, the Supreme Court, after gaining experience with certain business practices, found that because of these businesses' severe anticompetitive impact and lack of countervailing economic benefit, they should be conclusively presumed to result in an unreasonable restraint of trade. *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Supreme Court identified the practices that required *per se* treatment as those having a "pernicious effect on competition" and lacking "any redeeming virtue." *Id.* at 5, 78 S.Ct. at 518; see *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). The Supreme Court has cautioned, however, that "departure from the Rule-of-Reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977). If the restraint does not fall into one of the narrow categories deemed illegal *per se,* it must be analyzed under the Rule of Reason, which requires plaintiff to show an anticompetitive market effect. *Davis-Watkins Co. v. Service Merchandise Co.,* 500 F.Supp. 1244 (1980); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268 (7th Cir. 1981); *Borger v. Yamaha Int'l Corp.,* 625 F.2d 390, 397 (2d Cir. 1980).

In this case, plaintiff alleges that defendants have engaged in a group boycott designed to run him out of business. However, defendants argue that merely labelling their behavior a group boycott does not make it a group boycott. Defendants further argue that classification of their actions as a group boycott does not automatically trigger application of the *per se* rule. *Continental T.V., supra,* at 58–59, 97 S.Ct. at 2562; *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1383 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). The Court finds that defendants' activities in this case do not fall within the "group boycott" category requiring application of the *per se* rule. The *Klor's* case cited by plaintiff involved a boycott of Klor's (a retail store) by a competitor (Broadway-Hale, a department store chain) and ten national manufacturers and their distributors.

Broadway-Hale used its *monopolistic buying power* to persuade the other defendants either not to sell to Klor's or to sell to Klor's only at discriminatory prices and highly unfavorable terms. *Klor's, supra,* at 208–09, 79 S.Ct. at 707. The Supreme Court held that the *per se* rule applied because the combination, by its nature, character, and *power,* had a monopolistic tendency. *Id.* at 213, 79 S.Ct. at 710. As recently stated in *Smith v. Pro Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1979), "[T]he classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from non-group members who seek to compete at that level. . . ." *Id.* at 1178.

In the present case, the general surgeons in the Northern Kentucky area (i.e., the direct competitors of plaintiff) were not involved in a refusal to deal. The remaining defendants were not competitors of plaintiff but were members of an illusory or hypothetical medical team.[7] For various reasons, the other members of this "team" did not associate with Dr. McElhinney or did so infrequently. It cannot be said that the other members' refusal to deal, whether total or partial, smacks of a "monopolistic tendency". See *Smith, supra,* at 1178. There is a glaring absence of evidence that the members of defendants' medical team possessed any sort of monopolistic powers, or that their services were so unique that plaintiff was denied a reasonable alternative of services of a like quality and quantity from other physicians (who were ready, willing and able to serve) in the same general competitive market area, thereby causing injury to the public's need for medical services and supplies. (See statistics cited under *Market Area* analysis below). Therefore, the Court cannot label the ac-

tions of these remaining defendants a group boycott notwithstanding *prima facie* evidence of an agreement to effect a concerted refusal to deal and/or associate with plaintiff.

Even assuming, however, that defendants' actions could be labelled a group boycott, the Court cannot find that they had such a potential for evil and harm to the relative competitive market for medical services and supplies so as to be classified as pernicious and without plausible redeeming virtues and thereby requiring imposition of the *per se* rule. Specifically, the Court finds that the restraints were at most temporary and partial, having the possible virtues of 1) redeeming a failing venture (the hospital)[8], and 2) upgrading and improving the morale of the professional group resulting in an ultimate benefit to the public. Moreover, the Court finds that the acts of these four remaining defendants are not indicative of an obvious anticompetitive scheme.

## PROFESSIONAL EXEMPTION

The defendants further contend that this case should be analyzed under the Rule of Reason because the alleged activities were professional and not commercial in nature. They argue that the hearings concerning staff privileges, the referral of charges to the Kentucky Medical Association, and the decisions of the individual doctors not to refer patients to plaintiff were all undertaken for the purpose of providing quality medical care to the public. Plaintiff argues that *Maricopa, supra,* requires application of the *per se* rule. The Court has reviewed the major antitrust cases involving the learned professions and finds that the Rule of Reason is properly invoked in this case.

7. The Court would characterize the actions of these defendants as decisions of a joint venture between the physicians and the hospital. In antitrust law, the term "joint venture" denotes a group of independent economic actors who have joined together, in part, to provide a common product or service. *Antitrust and Hospital Privileges,* 70 Calif.L.Rev. 595, 657 (1982). In this case, the common product or service provided by the joint venture is medical care and supplies to the public. Joint ventures are

generally analyzed under the Rule of Reason, and are upheld if there are "legitimate business reasons" for the activity. *Id.* citing Pitofsky, *Joint Ventures Under the Antitrust Laws: Some Reflections on the Significance of Penn-Olin,* 82 Harv.L.Rev. 1007, 1018 (1969).

8. It is uncontroverted that Booth Hospital was forced to relocate from Covington to Boone County in order to compete with the other community hospitals.

In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court noted that the unique nature of learned professions prevents the wholesale application of antitrust laws to those professions.

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.

*Id.* at 788–89 n. 17, 95 S.Ct. at 2014 n. 17. The Supreme Court stated later, however, that the cautionary footnote in *Goldfarb* "cannot be read as fashioning a broad exemption under the Rule of Reason for learned professions." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978). But the Court adhered to the view expressed in *Goldfarb* that professional services by nature may differ significantly from other business services, and that, as a result, the competitive nature of such services may vary. *Id.* The Court concluded that "[E]thical norms may serve to regulate and promote this competition, and thus fall within the Rule of Reason." *Id.*

The Supreme Court's most recent pronouncement on this issue is found in *Maricopa, supra.* While citing with approval the exemption noted by *Goldfarb* and *Professional Engineers,* the Court in Maricopa concluded that the exemption was inapplicable because "[t]he price fixing agreements in this case ... are not premised on public service or ethical norms." *Maricopa, supra,* ——— U.S. at ———, 102 S.Ct. at 2479. It appears then, that the Supreme Court would consider applying the Rule of Reason even to cases involving restraints *commercial* in nature if the restraints were premised on "public service or ethical norms." [9] *Id.*

 The restraint in the present case is noncommercial in nature. It is primarily a disciplinary proceeding by and within a professional group. At most, there is a thin economic overlay.[10] The patent economic factor and impact present in *Maricopa* simply is not present here. Even assuming the restraint by defendants were primarily commercial in nature, it is entirely possible that it would be premised on public service or ethical norms, and therefore deserving of a Rule of Reason analysis. The Court will therefore apply the Rule of Reason analysis in this case.

### RULE OF REASON

The Court has determined that defendants' actions must be analyzed under the Rule of Reason. The classic statement of the Rule of Reason was made by Justice Brandeis in *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the Court must ordinarily consider the facts peculiar to the business to which the restraint is ap-

**9.** In *Veizaga v. National Board of Respiratory Therapy,* 1977–1 Trade Cases (CCH) ¶ 61,274 (N.D.Ill. Jan. 27, 1977), the Court used a two-step analysis in determining which rule applied. First, if the challenged activity is, by its nature and character, commercial, the *per se* rule would apply. If it were noncommercial, a Rule of Reason analysis would be applied. *Maricopa* seems to go further and permit Rule of Reason analysis in cases where the restraint is commercial in nature, but is premised on public service or ethical norms.

**10.** The evidence does show that some of defendants blamed plaintiff for rising insurance premiums due to his participation in medical malpractice actions brought against defendants and other physicians in the area.

plied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 243.

■ Rule of Reason analysis requires a showing by plaintiff of anti-competitive market effect. *Davis-Watkins Co. v. Service Merchandise, supra,* at 1251. *Lektro-Vend Corp. v. Vendo Co., supra,* at 268. In evaluating anti-competitive market effect, the following factors should be considered:

1. The market area involved;
2. The nature of the particular industry, product, or service involved;
3. The nature of the alleged restraint and its effect, actual or probable;
4. The reasons for adopting the particular practice which is alleged to constitute the restraint; and
5. The condition of the business before and after the restraint was imposed.

*Chicago Bd. of Trade, supra,* at 238, 38 S.Ct. at 243.

### MARKET AREA

The evidence establishes that the market area involved included Kenton, Campbell and Boone Counties of Northern Kentucky, Hamilton County of Southern Ohio, and Dearborne County of Southern Indiana. Evidence was introduced showing some 20 hospitals existed in the market area during 1974 to 1978. The evidence also reflects that in 1970 there were 14 general surgeons and 201 physicians of all specialties practicing in the Northern Kentucky area alone. In 1972, the numbers rose to 15 and 208 respectively. In 1974, the figures were 17 and 230 respectively. In 1976, the number of general surgeons had increased to 19, and the number of physicians of all specialties had increased to 248. In 1978, the figures were 19 and 283 respectively. The evidence also shows that there were many capable surgeons in Cincinnati as well. Finally, the evidence reflects that the popula-

tion of the three-county Northern Kentucky area increased from 250,956 in 1970 to 266,271 in 1980, an increase of 6.1 percent. The evidence does not reflect the size and composition of the market except as to the three-county Northern Kentucky area.

### NATURE OF SERVICE INVOLVED

The Court finds that the nature of the service or product involved is the furnishing of medical services and supplies by the hospital and the individual doctors as a joint venture in the market area described above. The defendant doctors argue that the product or competitive market is that for a general surgeon, while the defendant hospital contends that the product or competitive market is the services and supplies of a hospital. The Court, in considering the evidence most favorable to plaintiff, adopts the more expanded market.

### NATURE OF RESTRAINT AND EFFECT

■ The evidence reflects a partial restraint on plaintiff's practice at Booth Hospital. Plaintiff's name was excluded from the active list of the medical staff from 1974 to 1977 and from the rotation list in 1977. In addition, there is evidence of a slowdown in examination of specimens, and breakdowns in scheduling operations. Finally, there is evidence of refusals to deal by Drs. Hess and Herringer. Nevertheless, the evidence reveals that during the time plaintiff's name was not on the lists mentioned above, he still practiced at the hospital. Dr. McElhinney retained his privileges and his name was eventually put back on the active list and rotation list. Therefore, there was never actually a total restraint or boycott by Booth Hospital and/or these four defendants. Although admittedly there were slowdowns in services at the hospital, these slowdowns did not prevent Dr. McElhinney from performing operations. The evidence reflects attempts not to renew plaintiff's staff privileges at the hospital and suspension of plaintiff's license to practice medicine in Kentucky. How-

ever, in view of the fact that plaintiff continued to practice medicine at Booth Hospital, the Court finds only a partial restraint or slowdown of services.

Although plaintiff has shown a drastic drop in the number of surgeries done by him during the relevant time period, he has failed to adduce any evidence of the *actual* effect or impact that defendants' allegedly unlawful conduct had on the relative competitive market; i.e., on the rendering and receiving of medical services and supplies in the defined market area. There is no evidence of the *probable* effect on the relative competitive market. Plaintiff contends that the evidence regarding one patient who refused to be operated on by a particular doctor because she wanted plaintiff is evidence of the effect of the restraint. However, in that instance, the patient asked for and got plaintiff. Statistically, the record is void of evidence reflecting the number of operations performed at Booth Hospital during the relevant period, and those performed at other hospitals in the area. Moreover, there is no evidence showing that patients did not go to plaintiff because of the restraint. Apparently, plaintiff based his case on the assumption that the *per se* doctrine would apply and that impact or effect would be presumed.

### JUSTIFICATIONS FOR ADOPTING "RESTRAINT"

Most of the evidence introduced concerned the reasons for adopting the particular practice which is alleged to constitute a restraint. Defendants contend that they did not want plaintiff practicing at Booth Hospital because he was a troublemaker. It appears that each defendant had a confrontation with plaintiff in which vulgarities, religious or ethnic slurs were made by plaintiff. The evidence also shows that defendants were concerned with plaintiff simultaneously attempting to cover up on his own errors while making their errors public. Finally, defendants felt that the quality of medical care would suffer were plaintiff to continue working at Booth Hospital.

### CONDITION OF MEDICAL SERVICES

By reasons of the paucity of evidence presented as to the condition of medical services and supplies in the relative market area after the "restraint" was imposed, it is impossible to determine whether the conduct of defendants had an anticompetitive or procompetitive effect. *Davis-Watkins, supra,* at 1252.

### CONCLUSION

Therefore, the Court finds that the impact of defendants' acts upon the relative competitive market for medical services is *de minimis.* The Court feels that sufficient evidence has not been presented upon this issue to make a jury issue. Accordingly, the motion for a directed verdict as to the remaining defendants must be granted.

An order in accordance with this opinion will issue herewith.